MARTIN MARIETTA MATERIALS,
INC., Plaintiff and Counterclaim–
Defendant Below, Appellant,

v.

VULCAN MATERIALS COMPANY,
Defendant and Counterclaim–
Plaintiff Below, Appellee.

No. 254, 2012.

Supreme Court of Delaware.

Submitted: May 31, 2012.
Decided: July 10, 2012.
Corrected: July 12, 2012.

Robert S. Saunders, Esquire, of Skadden, Arps, Slate, Meagher and Flom LLP, Wilmington, Delaware; Of Counsel: Rob-ert E. Zimet (argued), James A. Keyte and Susan L. Saltzstein, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Eric J. Gorman, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois, for Appellant.

Collins J. Seitz, Jr., David E. Ross and Garrett B. Moritz, Esquires, of Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Of Counsel: Kenneth B. Forrest, Theodore N. Mirvis (argued), George T. Conway III and William Savitt, Esquires, of Wachtell, Lipton, Rosen & Katz, New York, New York, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice:

On May 14, 2012, the Court of Chancery entered a final judgment and order after a trial in this action initially brought by Martin Marietta Materials, Inc. ("Martin") against Vulcan Materials Company ("Vulcan"). Granting judgment against Martin on Vulcan's counterclaims, the Court of Chancery enjoined Martin, for a four month period, from continuing to prosecute its pending Exchange Offer and Proxy Contest to acquire control of Vulcan. That injunctive relief was granted to remedy Martin's adjudicated violations of two contracts between Martin and Vulcan: a Non–Disclosure Letter Agreement (the "NDA") and a Common Interest, Joint Defense and Confidentiality Agreement (the "JDA").[1]

Martin appealed to this Court from that judgment. On May 16, 2012, this Court ordered that the case proceed on an expe-

---

1. Both agreements expressly provided that they would be construed under Delaware law. NDA, ¶ 10; JDA, ¶ 15. Except where other-wise indicated, these two agreements are referred to collectively in this Opinion as the "Confidentiality Agreements."

dited basis. Following briefing, oral argument was held on May 31, 2012. That same day, after deliberating, the Court entered an Order stating that the judgment would be affirmed for reasons that would be explicated in a formal Opinion to issue in due course. This is the Opinion contemplated by this Court's May 31, 2012 Order.

## THE FACTS [2]

### A. *Background Leading to the Confidentiality Agreements*

Vulcan and Martin are the two largest participants in the United States construction aggregates industry. That industry engages in mining certain commodities and processing them into materials used to build and repair roads, buildings and other infrastructure. Vulcan, a New Jersey corporation headquartered in Birmingham, Alabama, is the country's largest aggregates business; and Martin, a North Carolina corporation headquartered in Raleigh, North Carolina, is the country's second-largest.

Since the early 2000s, Vulcan and Martin episodically discussed the possibility of a business combination, but the discussions were unproductive and no significant progress was made.[3] In 2010, Ward Nye, who had served as Martin's Chief Operating Officer since 2006, was appointed Martin's Chief Executive Officer ("CEO"). After that, Nye and Vulcan's CEO, Don James, restarted merger talks.[4] In early April 2010, Vulcan's investment banker at Gold-

man Sachs first "test[ed] out" the new Martin CEO's interest.[5] Nye's positive response prompted a meeting with James later that month, which led to more formal discussions.

At the outset Nye was receptive to a combination with Vulcan, in part because he believed the timing was to Martin's advantage. Vulcan's relative strength in markets that had been hard hit by the financial crisis, such as Florida and California, had now become a short-term weakness. As a result, Vulcan's financial and stock price performance were unfavorable compared to Martin's, whose business was less concentrated in those beleaguered geographic regions. To Nye, therefore, a timely merger—before a full economic recovery and before Vulcan's financial results and stock price improved—was in Martin's interest.[6] Moreover, Nye had only recently been installed as Martin's CEO, whereas James, Vulcan's CEO, was nearing retirement age with no clear successor. To Nye, that suggested that a timely merger would also create an opportunity for him to end up as CEO of the combined companies.[7]

Relatedly, although Nye was willing to discuss a possible merger with his Vulcan counterpart, he was not willing to risk being supplanted as CEO. The risk of Nye being displaced would arise if Martin were put "in play" by a leak of its confidential discussions with Vulcan, followed by a hostile takeover bid by Vulcan or a third party. Nye's concern about a hostile deal was not fanciful: recently Martin had en-

---

**2.** The facts recited here are as found by the Court of Chancery in its 138 page, post-trial Opinion, *Martin Marietta Materials, Inc. v. Vulcan Materials Company*, 56 A.3d 1072 (Del.Ch.2012). Although Martin purports to dispute some of those facts in its briefs, it does not claim that any adjudicated facts are clearly wrong and should be overturned.

**3.** *Id.,* at 1079–80.

**4.** *Id.*

**5.** *Id.,* at 1079–80.

**6.** *Id.,* at 1080–82.

**7.** *Id.*

gaged in friendly talks with a European company that had turned hostile. The European company's hostile attempt to acquire Martin failed only because the financial crisis "cratered" the bidder's financing.[8]

Understandably, therefore, when Nye first spoke to Vulcan's banker, Goldman Sachs, in April 2010, he stressed that Martin was not for sale, and that Martin was interested in discussing the prospect of a friendly merger, but not a hostile acquisition of Martin by Vulcan. As the Chancellor found, Nye's notes prepared for a conversion with Vulcan's banker made it clear that "(i) Martin ... would talk and share information about a *consensual* deal only, and not for purposes of facilitating an *unwanted* acquisition of Martin ... by Vulcan; and even then only if (ii) absolute confidentiality, even as to the fact of their discussions, was maintained."[9] When James and Nye first met in April 2010, they agreed that their talks must remain completely confidential, and they operated from the "shared premise" that any information exchanged by the companies would be used only to facilitate a friendly deal.[10]

To secure their understanding, Nye and James agreed that their respective companies would enter into confidentiality agreements. That led to the drafting and execution of the two Confidentiality Agreements at issue in this case: the NDA and the JDA.

## B. *The NDA*

Nye related the substance of his conversations with James to Roselyn Bar, Esquire, Martin's General Counsel, and instructed Bar to prepare the NDA. In drafting the NDA, Bar used as a template an earlier agreement between Martin and Vulcan that had facilitated an asset swap transaction. Consistent with Nye's desire for strict confidentiality, Bar proposed changes to the earlier template agreement that were "unidirectional," *i.e.*, that enlarged the scope of the information subject to its restrictions and limited the permissible uses and disclosures of that covered information.[11]

In its final form, the NDA prohibited[12] both the "use" and the "disclosure" of "Evaluation Material," except where expressly allowed. Paragraph 2 permitted either party to *use* the other party's Evaluation Material, but "*solely for the purpose of evaluating a Transaction.*"[13] Paragraph 2 also categorically prohibited either party from *disclosing* Evaluation Material to anyone except the receiving party's representatives. The NDA defined "Evaluation Material" as "any nonpublic information furnished or communicated by the disclosing party" as well as "all analyses, compilations, forecasts, studies, reports, interpretations, financial statements, summaries, notes, data, records or other · documents and materials prepared by the receiving party ... that contain, reflect, are based upon or are generated from any such nonpublic information...."[14] The NDA defined "Trans-

---

8. *Id.,* at 1079–80.

9. *Id.,* at 1082 (italics added).

10. *Id.*

11. *Id.,* at 1082–83.

12. We refer to the NDA in the past tense because that agreement, which became effective on May 3, 2010, expired on May 3, 2012.

13. NDA ¶ 2 (italics added).

14. Excluded from this definition were certain categories of information described in NDA ¶ 1, none of which are relevant here. It is noteworthy that, in drafting the NDA, Ms. Bar expanded the definition of "Evaluation Material" to protect not only "nonpublic information furnished or communicated by the disclosing party," but also documents created by

action" as "a possible business combination transaction ... between [Martin] and [Vulcan] or one of their respective subsidiaries." [15]

Paragraph 3 of the NDA also prohibited the disclosure of the merger negotiations between Martin and Vulcan, and certain other related information, except for disclosures that were "legally required." Paragraph 3 relevantly provided that:

> Subject to paragraph (4), each party agrees that, without the prior written consent of the other party, it ... will not disclose to any other person, *other than as legally required,* the fact that any Evaluation Material has been made available hereunder, that discussions or negotiations have or are taking place concerning a Transaction or any of the terms, conditions or other facts with respect thereto (including the status thereof or that this letter agreement exists).[16]

Paragraph 4 defined specific conditions under which "legally required" disclosure of Evaluation Material (and certain other information covered by Paragraph 3) would be permitted:

> In the event that a party ... [is] requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, sub-

poena, civil investigative demand or other similar process) to disclose any of the other party's Evaluation Material or any of the facts, the disclosure of which is prohibited under paragraph (3) of this letter agreement, the party requested or required to make the disclosure shall provide the other party with prompt notice of any such request or requirement so that the other party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this letter agreement. If, in the absence of ... the receipt of a waiver by such other party, the party requested or required to make the disclosure ... should nonetheless, in the opinion of such party's ... counsel be legally required to make the disclosure, such party ... may, without liability hereunder, disclose only that portion of the other party's Evaluation Material which such counsel advises is legally required to be disclosed....

As the Chancellor found, "Paragraph (4) establishes the Notice and Vetting Process for disclosing Evaluation Material and Transaction Information that would otherwise be confidential under the NDA in circumstances [where] a party is 'required' to do so in the sense that the party had received an External Demand." [17] The

the receiving party on the basis of that information. *Martin Marietta Materials, Inc.,* 56 A.3d 1072, 1082–83.

15. NDA, Introductory Paragraph. The precedent template agreement had defined "Transaction" as a possible transaction "involving" Martin and Vulcan. Bar amended the template, by adding the words "business combination" and by substituting the term "between" for the word "involving." The Chancellor found that the amended wording was "more easily read ... to require joint agreement of the two companies themselves." *Martin Marietta Materials, Inc.,* at 1083.

16. Italics added. The earlier template agreement prohibited disclosure of the fact "that

Evaluation Material has been made available hereunder, that discussions or negations *are taking* place concerning a Transaction...." (Italics added). Ms. Bar broadened that language to prevent any disclosure of the fact that discussions *"have* [been] taking place." She also added a prohibition against disclosing the fact "that this letter agreement exists." Bar thus enlarged the definition of what the Chancellor, in his Opinion, called "Transaction Information," which is the information protected by Paragraph 3. *Id.,* at 1083–84.

17. *Id.,* at 1083–84. The Chancellor used the term "External Demand" as a shorthand reference to the listed sources that would gener-

Chancellor further concluded that Ms. Bar's addition of the words "Subject to paragraph (4)" at the beginning of NDA paragraph (3), is "most obviously read as being designed to prevent any reading of ¶ 3 that would permit escape from ¶ 4's narrow definition of legally required and ¶ 4's rigorous Notice and Vetting Process." [18]

Vulcan shared Martin's confidentiality concerns. It therefore agreed to include in the NDA the changes that Ms. Bar proposed to the predecessor template agreement.

## C. The JDA

Because the parties were exploring a combination of the two largest companies in their industry, antitrust scrutiny appeared unavoidable. After the NDA was signed, the two companies' inside and outside counsel met to discuss that issue.[19] The discussions implicated nonpublic, privileged information and attorney workproduct, leading Martin and Vulcan also to execute the JDA (which was drafted by outside counsel) to govern those exchanges.[20]

The JDA, like the NDA, prohibits and limits the use and the disclosure of infor-

mation that the JDA describes as "Confidential Materials." The critical prohibitions and limitations are found in JDA Paragraphs 2 and 4. Paragraph 2 prohibits the disclosure of Confidential Materials without "the consent of all Parties who may be entitled to claim any privilege or confidential status with respect to such materials...." JDA Paragraph 4 relevantly provides that "Confidential Materials will be used, consistent with the maintenance of the privileged and confidential status of those materials, solely for purposes of pursuing and completing *the Transaction.*" The JDA defines "Transaction" as "a *potential transaction being discussed* by Vulcan and Martin[ ] ... involving the combination or acquisition of all or certain of their assets or stock...." [21]

## D. Martin's Use and Disclosure of Vulcan's Information Covered by the NDA and JDA

After the JDA and the NDA were executed, Vulcan provided to Martin nonpublic information that gave Martin a window into Vulcan's organization, including detailed confidential information about Vulcan's business, revenues, and personnel.[22] Those disclosures enabled Martin to project more reliably the value of synergistic

ate a legal obligation to disclose. The court used the term "Notice and Vetting Process" as a shorthand reference to the procedural requirements for pre-disclosure notice and collaborative review of all contemplated disclosures with the non-disclosing party or its counsel, as specifically set forth in Paragraph 4 of the NDA. *Id.*, at 1077–78.

18. *Id.*, at 1129–30.

19. Unlike the NDA, the JDA has no agreed expiration date. For that reason, we sometimes refer to the JDA's provisions in the present tense.

20. *Id.*, at 1083–85.

21. JDA, ¶ 4 and Introductory Paragraph (italics added). An earlier draft of the JDA defined "Transaction" to mean "a transaction contemplated by Vulcan and Martin[ ]." Ms. Bar revised that definition to "a potential transaction being discussed by [Vulcan and Martin]...." The Chancellor found that "the only transaction that was 'being discussed' at the time the parties entered into the JDA was a negotiated merger ..." and that the parties' communications and conduct "evinc[ed] an understanding and desire that the information to be exchanged could only be used for purposes of considering a consensual, contractual business combination...." *Martin Marietta Materials, Inc.*, 56 A.3d at 1085, 1120.

22. *Id.*, at 1089–90.

cost-cutting measures that could be achieved from a combination of the two companies. Therefore, Martin needed Vulcan's nonpublic information to evaluate the two "gating issues" critical to any business combination transaction: possible antitrust-related divestitures and merger synergies.[23]

The Court of Chancery found, and Martin does not dispute, that Martin used and disclosed Vulcan's nonpublic information in preparing its Exchange Offer and its Proxy Contest to oust some of Vulcan's board members (collectively, the "hostile takeover bid"). Martin's position is that its use and disclosure of that nonpublic information was not legally prohibited by the Confidentiality Agreements. We address that legal argument in the Analysis section of this Opinion. At this juncture, we merely complete the factual narrative and highlight the trial court's findings regarding Martin's use and disclosure of Vulcan's non-public information to evaluate, plan and promote its Exchange Offer and Proxy Contest.[24]

It is undisputed that antitrust counsel and other representatives of both companies met on various occasions and exchanged non-public "Confidential Materials" relating to antitrust divestiture risks and synergies. What resulted was a joint antitrust analysis prepared by antitrust counsel for both sides in 2010. Months later, a meeting between Martin's and Vulcan's CFOs and controllers took place on March 8, 2011. The information exchanged at that meeting and the nonpublic information Martin had previously re-

ceived, caused Martin to revise its estimated merger synergies upwards by as much as $100 million annually, from the $150–$200 million it previously estimated.[25] That synergy jump, plus the fact that Martin's stock price had increased in relation to Vulcan's, led Martin to conclude that it "could offer Vulcan's shareholders a premium in a stock-for-stock exchange, yet still justify the deal to Martin's stockholders" on economic grounds.[26] Martin knew, however, that if it wanted to use all of its projected synergistic gains to justify the transaction, time was of the essence. Not only did current market conditions favor Martin, but also Vulcan already had plans to obtain certain cost savings on its own, independent of any deal with Martin.[27]

Accordingly, as the talks floundered soon after the March 8 meeting, Martin and its bankers began using Vulcan's confidential, nonpublic information to consider alternatives to a friendly deal. By April 2011, Martin's bankers were evaluating the constraints imposed by the NDA upon a non-consensual transaction. At a mid-August 2011 meeting, Martin's board formally authorized management to pursue alternatives to a friendly deal. Four months later, Martin launched its unsolicited Exchange Offer.

As a regulatory matter, an exchange offer carries a line-item requirement under federal securities law to disclose past negotiations. Martin announced its Exchange Offer on December 12, 2011, by sending Vulcan a public "bear hug" letter and filing a Form S–4 with the United States Securities and Exchange Commission ("SEC").

---

**23.** *Id.,* at 1084–89.

**24.** The trial court devoted 33 pages of its Opinion to factual findings regarding Martin's use and disclosure of Vulcan's nonpublic information. Because those findings are uncontested, we do not burden this Opinion with an exhaustive summary.

**25.** *Id.,* at 1087–89, 1090–91.

**26.** *Id.,* at 1093–94.

**27.** *Id.,* at 1091–94.

On January 24, 2012, Martin announced its Proxy Contest and filed a proxy statement in connection therewith.[28]

Both before and after Martin commenced its hostile takeover bid, Martin disclosed Vulcan's nonpublic information, first to third party advisors (investment bankers, lawyers and public relations advisors), and later publicly. Martin did that without Vulcan's prior consent and without adhering to the Notice and Vetting Process mandated by the NDA.[29] Regarding Martin's public relations advisors, the Chancellor found:

> Despite the Confidentiality Agreements, no effort was made to shield these advisors from receiving Evaluation Material or information relating to James' and Nye's negotiations. To the contrary, it is plain that the public relations advisors were given a blow-by-blow of Nye's and [Martin's CFO's] view of the negotiations with Vulcan and access to other Evaluation Material, and they advised Martin ... management how the process and substance of information sharing and negotiation could be translated into a public communications strategy that would exert pressure on Vulcan to accept an unsolicited bid from Martin ...[30]

As for its public disclosures, Martin's Form S–4 disclosed not only the history of the negotiations, but also other detailed information that constituted "Evaluation Material" and "Confidential Materials" under the respective Confidentiality Agreements. Those details, as the Court of Chancery found, included:

- Martin's anticipated annual cost synergies of $200 million to $250 million resulting from a merger with Vulcan;

- James' estimates of "achievable synergies" from a merger at different stages of the discussions, "including his belief as of June 2010 that 'a combination of the companies would result in approximately $100 million in synergies,' and not 'synergies at the $175 million to $200 million levels that Mr. Nye believed were achievable'; and James' supposed belief at the time the merger discussions ended, that 'the cost synergies to be achieved in a combination would [not] be greater than $50 million;' "

- "James' view of alternative deal structures designed to minimize tax leakage;"

- "James' conclusion, based on the merger discussions, that the 'potential tax leakage (i.e., taxes arising from the sale or other disposition of certain assets that may be required to obtain regulatory approvals) and the ability to divest overlap[ping] business were significant impediments to a transaction;' " and

---

**28.** In the Exchange Offer, Martin sought to acquire all of Vulcan's outstanding shares, based on an exchange ratio of .5 Martin share for each share of Vulcan. The exchange offer was conditioned on the receipt of tenders from 80% of Vulcan's shareholders, and contained a waivable condition that "Vulcan ... have entered into a definitive merger agreement with Martin[ ] with respect to the proposed transaction that is reasonably satisfactory to Martin[ ] and Vulcan." In its Proxy

Contest, Martin sought to elect four new members to Vulcan's classified board at Vulcan's upcoming annual meeting, which was scheduled to occur on June 1, 2012. The Chancellor found that the purpose of the Proxy Contest was "[t]o create a Vulcan board more receptive of its offer." *Id.,* at 1076.

**29.** *Id.,* at 1098–1101.

**30.** *Id.,* at 1098–99.

- "The fact that 'the legal teams did not identify any significant impediments to a business combination transaction' at their antitrust meeting on May 19, 2010." [31]

The disclosures by Martin to the SEC, the Chancellor found, "were ... a tactical decision influenced by [Martin's] flacks," and "the influence of these public relations advisors is evident in the detailed, argumentative S–4 filed by Martin[ ]." [32] Those disclosures, the trial court found, "exceeded the scope of what was legally required," [33] and involved "selectively using that [Evaluation] Material and portraying it in a way designed to cast Vulcan's management and board in a bad light, to make Martin['s] own offer look attractive, and to put pressure on Vulcan's board to accept a deal on Martin['s] terms." [34]

Lastly, the Chancellor found that after it launched its hostile takeover bid, Martin disclosed Evaluation Material and other confidential information "in push pieces to investors, off the record and on the record communications to the media, and investor conference calls." [35] Those disclosures "include[d] a detailed history of the discussions [and] negotiations that [had taken] place concerning 'the Transaction,' [and] references revealing the 'opinions,' 'analyses' and 'non-public information' of Vulcan" regarding issues such as required antitrust divestitures and synergies.[36]

### E. *The Court of Chancery's Post–Trial Determinations*

On December 12, 2011, the same day it launched its hostile takeover bid, Martin commenced this Court of Chancery action for a declaration that nothing in the NDA barred Martin from conducting its Exchange Offer and Proxy Contest. Vulcan counterclaimed for a mirror-image determination that Martin breached the NDA, and later amended its counterclaim to add claims that Martin had violated the JDA. Vulcan sought an injunction prohibiting Martin from proceeding with its hostile takeover bid.[37] The case proceeded on an expedited basis, and a trial on the merits took place from February 28 through March 2, 2012. On April 9, 2012, the Court of Chancery heard post-trial oral argument. On May 4, 2012 that court issued its post-trial Opinion. On May 14, 2012, the Chancellor entered a final order and judgment, enjoining Martin from (among other things) proceeding with its Exchange Offer and Proxy Contest for a four month period. Martin then terminated its Exchange Offer and Proxy Contest, and appealed to this Court from the trial court's final order and judgment.

In its Opinion, the Court of Chancery ultimately determined that Martin had breached the NDA and the JDA by impermissibly using and disclosing Evaluation Material under the NDA and Confidential Materials under the JDA. To reach those

---

**31.** *Id.,* at 1100 (internal footnotes and record citations omitted).

**32.** As examples, the Chancellor pointed to the S–4 "portray[ing] James as an obstinate CEO blocking a deal because he wants to stay in power and Nye as the rightful occupier of the CEO seat, backed by his board ..." and Martin's stated belief that "Vulcan was unwilling to consider significant actions to create more meaningful savings." *Id.,* at 1100–01.

**33.** *Id.,* at 1137–38.

**34.** *Id.,* at 1101–03.

**35.** *Id.,* at 1141–42.

**36.** *Id.,* at 1101–03.

**37.** Vulcan first alleged its breach of contract claims in a lawsuit it brought in an Alabama federal court. Eventually, the parties agreed that the Chancery action would proceed first, ahead of both the Alabama action and related litigation pending in New Jersey.

determinations, the trial court analyzed in depth, and construed, both agreements to determine whether they permitted or prohibited Martin's use and disclosure of Vulcan nonpublic information. The Chancellor found that specific disputed provisions of the NDA were ambiguous and, therefore, required resort to extrinsic evidence to determine the parties' intended meaning of those provisions. After considering the evidence and the applicable rules of construction, the Chancellor determined that Vulcan's interpretation controlled each provision that he found to be legally ambiguous. The trial court also determined that certain provisions of the NDA, and all of the relevant provisions of the JDA, were *unambiguous* and independently precluded Martin from using and/or disclosing JDA protected information.

Specifically, the Court of Chancery found that, although the Confidentiality Agreements did not contain a "standstill" provision, they did bar Martin (and Vulcan) from:

- "Using the broad class of 'evaluation material' defined by the confidentiality agreements except for the consideration of a contractually negotiated business combination transaction between the parties, and not for a combination that was to be effected by hostile, unsolicited activity of one of the parties;"
- "Disclosing either the fact that the parties had merger discussions or any evaluation material shared under the confidentiality agreements unless the party was legally required to disclose because: (i) it had received 'oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process;' and

(ii) its legal counsel had, after giving the other party notice and the chance for it to comment on the extent of disclosure required, limited disclosure to the minimum necessary to satisfy the requirements of law;" and

- "Disclosing information protected from disclosure by the confidentiality agreements through press releases, investor conference calls, and communications with journalists that were in no way required by law." [38]

### *MARTIN'S CLAIMS OF ERROR*

The record establishes, and the Court of Chancery found, that Martin's conduct inflicted on Vulcan "exactly the same kind of harm Nye demanded the Confidentiality Agreements shield Martin[ ] from." [39] Martin characterizes that factual finding as inaccurate, but does not claim that it requires reversal. Rather, Martin challenges the trial court's legal determination that Martin violated the NDA and the JDA, and the resulting grant of injunctive relief. Those determinations, Martin claims, constitute reversible error, because as a matter of law the Confidentiality Agreements permitted Martin to use and disclose Vulcan's nonpublic information in the manner that it did.

Martin advances four specific claims of error on this appeal. *First*, Martin contends that the trial court erred in going beyond the plain language of the NDA, which unambiguously permitted the use of Evaluation Material to conduct its hostile Exchange Offer and Proxy Contest. *Second*, Martin claims that the court erroneously held that the NDA prohibited Martin from disclosing Evaluation Material and information about the merger discussions without prior notice and vetting, because

---

**38.** *Id.,* at 1075–76.

**39.** *Id.,* at 1144–46.

the disclosures it made were "legally required" to conduct its hostile takeover bid. *Third*, Martin argues that the trial court's determination that Martin breached the JDA was erroneous, because: (i) the JDA unambiguously makes itself "subservient" to the NDA, with the result that compliance with the NDA *ipso facto* constitutes compliance with the JDA, and (ii) alternatively, and in any event, the trial court erroneously found that Martin had breached the JDA's "use" restriction. *Fourth*, Martin claims that the Court of Chancery erred by improperly balancing the equities and granting injunctive relief without proof of actual injury.

 Martin's first three claims of error involve judicial interpretation of a contract, which present questions of law that this Court reviews *de novo*.[40] Martin's fourth claim, which challenges the grant of injunctive relief, is reviewed for abuse of discretion.[41]

We conclude, for the reasons next discussed, that the Chancellor committed no legal error or abuse of discretion, and correctly concluded (*inter alia*) that: (i) the JDA prohibited Martin from using and disclosing Vulcan Confidential Materials to conduct its hostile bid; (ii) the NDA prohibited Martin from disclosing Vulcan Evaluation Material without affording Vulcan pre-disclosure notice and without engaging in a vetting process; (iii) Martin breached the use and disclosure restrictions of the JDA and the disclosure restrictions of the NDA; and (iv) injunctive relief in the form granted was the appropriate remedy for those adjudicated contractual violations. Because we affirm the Court of Chancery's judgment on these grounds, we do not reach or decide the other bases for the contractual violations adjudicated by the trial court.[42]

## ANALYSIS

### A. Preliminary: Confidentiality And Standstill Agreements Distinguished

Before turning to Martin's substantive claims of error, we first address a side assertion that pervades all of those claims. Martin asserts that by interpreting the Confidentiality Agreements in the manner it did, the Court of Chancery "stealthily" converted those two contracts into a standstill agreement, which neither party intended or agreed to. Besides being factually incorrect, this argument is irrelevant to, and distracts from, a proper analysis of the contractual issues genuinely presented. For that reason we first address that argument preliminarily.

Standstill agreements and confidentiality agreements are qualitatively different.[43]

---

40. *BLGH Holdings, LLC v. enXco LFG Holding, LLC*, 41 A.3d 410 (Del.2012); *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1181 (Del.1992). "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006). Absent textual ambiguity, Delaware courts fulfill that role by according to contractual language the ordinary meaning that "a reasonable person in the position of the parties would have thought [the words] meant." *Id.* (citation omitted).

41. *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 40 (Del.1998); *see also, Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del.2010).

42. Specifically, we do not reach or address the merits of Martin's claims that the Court of Chancery erred in concluding that Martin violated the NDA's use prohibitions, and certain NDA disclosure restrictions. Our declination to address those determinations should not be viewed as approval or disapproval by this Court of either those determinations or the reasoning the trial court employed to reach them.

43. Our use of the terminology "standstill agreement" and "confidentiality agreement"

A standstill agreement expressly prohibits specific conduct by a contracting party to acquire control of the other contracting party.[44] Typically, a standstill agreement will prohibit a hostile bid in any form, including a hostile tender offer to acquire stock control of the other contracting party and/or a proxy contest to replace all or some of its directors. Standstill prohibitions do not require, or in any way depend upon, a contracting party's use or disclosure of the other party's confidential, nonpublic information. Rather, a standstill agreement is intended to protect a contracting party against hostile takeover behavior, as distinguished from the unauthorized use or disclosure of the other party's confidential nonpublic information.

A confidentiality agreement, in contrast, is intended and structured to prevent a contracting party from using and disclosing the other party's confidential, nonpublic information except as permitted by the agreement.[45] In that respect it is qualitatively distinguishable from a prohibition that precludes a party categorically from engaging in specified hostile takeover activity. Thus, a confidentiality agreement will not typically preclude a contracting party from making a hostile bid to acquire control of the other party, so long as the bid does not involve the use or disclosure of the other party's confidential, nonpublic information. A confidentiality agreement is intended to protect a contracting party's non-public information,[46] not its corporate ownership and control.

It is undisputed that the Confidentiality Agreements in this case were true confidentiality agreements, not standstill agreements. They did not categorically preclude Martin from making a hostile takeover bid for Vulcan. What they did was preclude Martin from using and disclosing Vulcan's confidential, nonpublic information except insofar as the agreements themselves permitted. The Court of Chancery clearly understood that distinction. It interpreted and enforced the disputed agreements in this case as confi-

should not be read to imply that standstill and confidentiality prohibitions are necessarily, or even customarily, embodied in separate instruments. Contracts denominated as standstill agreements may also contain confidentiality provisions, and instruments denominated as confidentiality agreements may contain standstill provisions. ABA Mergers and Acquisitions Committee, *Model Confidentiality Agreement* 343 (2011) (describing "standstill provisions" such as a stock purchasing prohibition as another type of "provision[ ] that may be included in a confidentiality agreement").

44. *See, e.g.,* Igor Kirman, *M & A and Private Equity Confidentiality Agreements Line by Line* 59 (2008) (stating that sellers desire a standstill agreement to preclude a buyer "from taking a broad list of actions that generally include buying securities ... [and] engaging in proxy solicitation"); Meryl S. Rosenblatt, *Letters of Intent and Exclusivity, Confidentiality and Standstill Agreements,* 1459 PLI/Corp 215, 237 (2004) (describing a "standstill

agreement" as prohibiting a buyer from "acquiring the target's voting securities [and] waging proxy contests," among other actions).

45. See Lou R. Kling and Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions,* Volume 1, § 9.02 (2011 ed.) (stating that NDAs "usually provide that [confidential information] ... will be held as confidential and will be used only in connection with an evaluation of the transaction in question"); ABA Mergers and Acquisitions Committee, *Model Confidentiality Agreement* 342–43 (2011) (listing, among others, confidentiality and use restrictions "normally" provided for in non-disclosure agreements).

46. *See,* Kirman, *supra* note 44, at 7 (describing parties' "decision to share information about themselves" as a "first step toward a deal" that is also "coupled with a strong desire to contractually protect against [the] misuse and unwanted disclosure [of that information]").

dentiality agreements, using the appropriate tools of contract interpretation. On review by this Court, the issue is whether the Court of Chancery properly applied the canons of contract interpretation to the NDA and the JDA as confidentiality agreements. For Martin to claim that the Court of Chancery, in discharging that function, transformed those contracts into standstill agreements, is factually wrong and confuses the distinction between these two qualitatively different contractual forms.

Having cleared away the underbrush, we turn to the merits of Martin's claims of error.

## B. *Martin's Violations of the JDA*

The Chancellor determined that Martin, in making its hostile bid, both "used" and "disclosed" Vulcan Confidential Materials in violation of the JDA. That agreement (the trial court found) unambiguously prohibits the use of "Confidential Materials" without Vulcan's consent, except "for purposes of pursuing and completing the Transaction," which the JDA defines as "a potential transaction being discussed by Vulcan and Martin. . . ." The Court of Chancery found as fact that "the only transaction that was 'being discussed' at the time the parties entered into the JDA was a negotiated merger," [47] and that "neither [the] Exchange Offer nor [the] Proxy Contest . . . was 'the' transaction that was 'being discussed' at the time that the JDA was negotiated." [48]

Martin asserts that those determinations are reversibly erroneous, for three reasons. First, Martin claims, the court erred in concluding that the only transaction "being discussed" when the parties entered into the JDA was a negotiated merger. Second, Martin advances the related claim that, even if "Transaction" meant a negotiated transaction, Martin committed no contractual breach, because "the JDA expressly allows the use of [protected] information 'for purposes of *pursuing and completing* the Transaction,' " [49] and Martin's hostile bid "ultimately will facilitate . . . a negotiated transaction." Third, Martin claims that the JDA, by its own terms, is "subservient" to the NDA, because JDA Paragraph 12 relieves Martin of liability for any breach of the JDA so long as Martin complies with the NDA. All these claims lack merit.

■ Martin portrays its first argument—that the Chancellor erroneously concluded that neither the Proxy Contest nor the Exchange Offer was the "potential transaction being discussed"—as presenting a purely legal question of contractual interpretation that is subject to *de novo* review. That portrayal is not accurate. The challenged determination presents a mixed question of fact and law. Although our review of its contract interpretation component is *de novo*, the challenged factual component will not be overturned unless it is found to be clearly wrong. [50]

■ The trial court properly found that the relevant operative language of the JDA—"a potential transaction being discussed"—is unambiguous, and Martin does not seriously contend otherwise. The only remaining dispute, accordingly, is factual: what transaction was "being discussed?" The *only* transaction being discussed, the

---

47. *Martin Marietta Materials, Inc. v. Vulcan Materials Company,* 56 A.3d 1072, 1119–21 (Del.Ch. 2012).

48. *Id.,* at 1121–22.

49. Italics added.

50. *Bank of New York Mellon Trust Co., N.A. v. Liberty Media Corp.,* 29 A.3d 225, 236 (Del. 2011).

trial court found, was a negotiated merger. To say that that finding is not "clearly wrong" would be an understatement: the finding is amply supported by the evidence. Nye told Vulcan that Martin was not for sale. Nye told Vulcan that Martin was interested in discussing the prospect of a merger, *not* an acquisition, whether by Vulcan or otherwise. And, Nye described the transaction under discussion as a "modified merger of equals."

Equally unpersuasive is Martin's alternative contention that even if "Transaction" means a negotiated merger, Martin did not violate the JDA's use restriction, because the JDA expressly allowed Martin to use Confidential Materials "for purposes of pursuing and completing the Transaction," and Martin's hostile bid "ultimately will facilitate . . . a negotiated transaction." That claim fails because the Chancellor found as fact that the only transaction being discussed would be "friendly" or "negotiated." That finding expressly and categorically excluded Martin's "hostile bid or a business combination . . . effected by a pressure strategy."[51] We uphold the Chancellor's factual finding that the transaction "being discussed" for purposes of the JDA's "use" restriction did not encompass a merger accomplished by means of hostile tactics. Martin's second claim of error, therefore, fails for the same reason as its first.

Martin's third claim is essentially that the JDA creates no restrictions independent of those already imposed by the NDA. Therefore (the argument runs), since Martin did not violate the NDA, it could not have violated the JDA. The sole foundation for this argument is language found in Paragraph 12 of the JDA, which provides that "[n]either the existence of nor any provision contained in this Agreement shall affect or limit any other confidentiality agreements, or rights or obligations created thereunder, between the Parties in connection with the Transaction."

The Chancellor was not persuaded by this argument, and neither are we. If adopted, Martin's reading would turn Paragraph 12's language on its head. That provision, in context, plainly says— and means—that neither the existence nor the contents of the JDA ("this Agreement") shall "affect or limit any other confidentiality agreements (the NDA) or rights or obligations created thereunder." Martin's reading would generate the opposite result, namely, that the rights and obligations created in the NDA would specify and limit when Vulcan and Martin could use and disclose Confidential Materials protected by the JDA. As Vulcan correctly argues, no reasonable reading of the JDA (or the NDA) "support[s] that absurd result, which would reduce the JDA to a nullity. . . ." That result would also violate the "cardinal rule . . . that, where possible, a court should give effect to *all* contract provisions."[52] The Chancellor correctly declined to adopt an interpretation of Paragraph 12 that would rob the JDA of any independent legal significance.

Other than its claim based on Paragraph 12, which we reject, Martin suggests no basis to overturn the Court of Chancery's

---

**51.** *Martin Marietta Materials, Inc.,* 56 A.3d at 1119–23.

**52.** *Sonitrol Holding Co. v. Marceau Investissements,* 607 A.2d 1177, 1184 (Del.1992) (italics in original) (citing *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1114 (Del.1985); *see also, Axis Reins. Co. v. HLTH Corp.,* 993 A.2d 1057, 1063 (Del.2010)) ("[W]here a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions").

reading of the JDA's "disclosure" restrictions in JDA Paragraph 2. The court read the JDA to require Martin to obtain Vulcan's approval before disclosing any Confidential Materials covered by the JDA.[53] We agree that the JDA unambiguously so required, and the Court of Chancery's factual finding—that Martin disclosed JDA-protected Confidential Materials without Vulcan's approval in the course of conducting its hostile bid—is uncontested.

For these reasons, we uphold the Chancellor's conclusion that Martin used and disclosed Vulcan Confidential Materials in violation of the JDA.

### C. *Martin's Violations of the NDA*

We next consider Martin's challenges to the Chancellor's determination that Martin violated the disclosure restrictions of the NDA. The Chancellor found as fact that Martin disclosed Vulcan confidential information, including Evaluation Material, in the course of pursuing its hostile bid, and Martin does not contest that finding. Rather, Martin's claim before us is that its disclosure of Vulcan confidential information was permitted by Paragraph 3 of the NDA, and that the Court of Chancery erred in holding otherwise. This claim rests upon a somewhat intricate (and fragile) structure of subsidiary arguments, which run as follows: (i) Martin was entitled to disclose Vulcan confidential information, including Evaluation Material, that was otherwise protected under the NDA without Vulcan's prior consent, if disclosure was "legally required;" (ii) the disclo-

sure of Vulcan's confidential information in publicly filed documents was "legally required" by SEC Rules applicable to exchange offers; (iii) the Vulcan confidential information that Martin disclosed to investors was legally permitted because that disclosure was already "legally required" by SEC Rules; and (iv) Martin was not contractually obligated to give Vulcan prior notice of any intended disclosures, or to engage in a pre-disclosure vetting process, because those procedural requirements applied only to disclosures made in response to an "External Demand" arising in the course of a legal proceeding,[54] and no such External Demand was ever made.

These arguments were presented to the Court of Chancery, which rejected them for a host of reasons that entailed a searching and intensive analysis of a multitude of factual and legal issues. To oversimplify, the Court of Chancery analyzed Martin's position under two separate, alternative approaches. First, the court held that Paragraphs 3 and 4 were ambiguous. After resorting to extrinsic evidence, the court determined that Paragraph 3, most reasonably interpreted, does not independently allow a contracting party to make legally required disclosures, unless the disclosures are preceded and triggered by an External Demand. In the alternative, the Chancellor also held that Paragraph 3, viewed alone, *unambiguously* did *not* permit the disclosure of one specifically defined information category— "Evaluation Material"—even if disclosure

---

**53.** Paragraph 2 of the JDA provided:

> Parties or Other Signatories will not disclose Confidential Material to any other person or entity, without first obtaining the consent of all Parties who may be entitled to claim any privilege or confidential status with respect to such materials, as well as the consent of their Counsel.

**54.** As earlier noted (*see supra* note 17), the trial court used the term "External Demand" as a shorthand reference to (in the language of NDA Paragraph 4) "oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process." As used in this Opinion, "External Demand" has that same meaning.

were otherwise "legally required." The right to disclose Evaluation Material, the trial court held, was conferred only by Paragraph 4, and could be exercised only if preceded and triggered by an External Demand, and after having engaged in the Notice and Vetting Process outlined in that paragraph.

■ In our review of the Court of Chancery's resolution of this question, we need not, and do not, reach or decide the merits of its ambiguity-based analysis. Instead, we uphold the result based on the trial court's alternative holding. More specifically, we conclude, as a matter of law based upon the NDA's unambiguous terms, that: (i) Paragraph 3, of itself, does not authorize the disclosure of "Evaluation Material," even if such disclosure is otherwise "legally required;" (ii) Paragraph 4 is the only NDA provision that authorizes the disclosure of Evaluation Material; (iii) any disclosure under Paragraph 4 is permitted only in response to an External Demand and after complying with the pre-disclosure Notice and Vetting Process mandated by that paragraph; and (iv) because no External Demand was made and Martin never engaged in the Notice and Vetting Process, its disclosure of Vulcan's Evaluation Material violated the disclosure restrictions of the NDA.[55]

The contract provisions that relate to this issue are Paragraphs 2, 3 and 4 of the NDA. Paragraph 2, entitled *"Use of Evaluation Material,"* categorically prohibits the disclosure of a party's Evaluation Material to anyone other than the receiving party's representatives.[56] Paragraph 3, which is entitled *"Non–Disclosure of Dis-*

*cussions; Communications,"* also prohibits the disclosure of certain information relating to merger "discussions or negotiations" between Martin and Vulcan. But, Paragraph 3 also carves out an exception that permits disclosure of that information where disclosure is "legally required":

> Subject to paragraph (4), each party agrees that, without the prior written consent of the other party, it and its Representatives will not disclose to any other person, other than as legally required, the fact that any Evaluation Material has been made available hereunder, that discussions or negotiations have or are taking place concerning a Transaction or any of the terms, conditions or other facts with respect thereto (including the status thereof or that this letter agreement exists).

At this point it is helpful to pause and identify which "legally required" disclosures Paragraph 3 does—and does not—permit. By its terms, Paragraph 3 covers only three categories of information: (a) the fact that any Evaluation Material has been made available; (b) the fact that discussions or negotiations concerning a Transaction have been taken or are taking place; and (c) any of the terms, conditions or other facts with respect thereto [*i.e.*, to the negotiations] including the status thereof [*i.e.*, the negotiations] or that the NDA exists. *Not included within those categories is the substance of a party's Evaluation Material*—as distinguished from "the fact that ... Evaluation Material has been made available."

The omission of Evaluation Material from the coverage of Paragraph 3 is both

---

**55.** We assume (without deciding) for the purposes of this analysis that: (i) Martin's disclosures were "legally required" by SEC rules and (ii) Martin's repetitious disclosures of that information to investors and media did not independently violate the NDA.

**56.** NDA ¶ 2 ("Each party agrees that ... the disclosing party's Evaluation Material will be kept confidential and each party and its Representatives will not disclose ... any of the other party's Evaluation Material in any manner whatsoever....").

intentional and logical. Although Paragraph 3 does not expressly prohibit the disclosure of Evaluation Material, it does not need to. Paragraph 2 accomplishes that. Evaluation Material does not fall with Paragraph 3's "legally required" carve-out exception, because that exception can *only* apply to the confidential information specifically identified in Paragraph 3. Moreover—and of critical importance—the permitted disclosure of Evaluation Material is explicitly and separately made the subject of Paragraph 4, which is entitled *"Required Disclosure."* Paragraph 4, by its terms, addresses the disclosure of "any of the other party's Evaluation Material *or* any of the facts, the disclosure of which is prohibited under paragraph (3) of [the NDA]." [57]

Paragraph 4 also mandates a procedural framework within which legally required disclosure of Evaluation Material is permissible. That framework has two elements. The first is that Evaluation Material must be the subject of an External Demand. The second is that a party contemplating disclosure of that information must give pre-disclosure notice of any intended disclosure and (where applicable) engages in a vetting process.

To illustrate how these two elements operate structurally, we divide Paragraph 4 into two parts. The first creates a right to prior notice to enable the adversely affected party to seek appropriate judicial relief:

> In the event that a party or any of its Representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the other party's Evaluation Material or any of

the facts, the disclosure of which is prohibited under paragraph (3) of this letter agreement, the party requested or required to make the disclosure shall provide the other party with prompt notice of any such request or requirement so that the other party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this letter agreement.

The second part comes into play if a contracting party, for whatever reason, does not seek or obtain court protection. In those circumstances, Paragraph 4 mandates an extrajudicial "vetting" process:

> If, in the absence of a protective order or other remedy or the receipt of a waiver by such other party, the party requested or required to make the disclosure or any of its Representatives should nonetheless, in the opinion of such party's [or its Representative's] counsel, be legally required to make the disclosure, such party or its Representative may, without liability hereunder, disclose only that portion of the other party's Evaluation Material which such counsel advises is legally required to be disclosed; provided that the party requested or required to make the disclosure exercises its reasonable efforts to preserve the confidentiality of the other party's Evaluation Material, including, without limitation, by cooperating with the other party to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the other party's Evaluation Material.

██ To recapitulate, Paragraphs 2, 3, and 4, both internally and when read together, unambiguously permit a party to the NDA to disclose "legally required" Evaluation Material. But, that may be

---

57. Italics added.

done *only* if an External Demand for such information has first been made, and *only* if the non-disclosing party is then given prior notice of any intended disclosure and (where applicable) an opportunity to vet the information sought to be disclosed. The Court of Chancery properly so concluded. In our view, that interpretation is compelled by the text of these NDA provisions, their relationship to each other, and by the canon of construction that requires all contract provisions to be harmonized and given effect where possible.[58] That also is the only interpretation that is consistent with the found facts relating to the NDA's overall purpose and import, and the parties' reasons for negotiating the specific language of the disputed NDA provisions.

Martin's contrary argument rests on the premise that Evaluation Material is textually included within the purview of Paragraph 3. Martin claims that the following italicized phrase in Paragraph 3 captures Evaluation Material: "[E]ach party agrees [not to disclose, other than as legally required,] ... that discussions or negotiations have or are taking place concerning a Transaction or any of the terms, conditions, or *other facts with respect thereto* (including the status thereof or that this letter agreement exists)."[59]

Martin's argued-for interpretation—that "other facts with respect thereto" must be read to cover Evaluation Material—finds no support in the specific language and structure of the NDA. It is also unreasonable. Any doubt about the scope of the phrase "other facts with respect thereto" is put to rest by considering the broader language of which that phrase is but one

moving part. The context clarifies that the phrase, "other facts with respect *thereto*," means specific facts indicating that there were "discussions or negotiations ... concerning a Transaction," including the fact that the NDA even exists. That peripheral species of information differs markedly from the substantive, company-specific internal information that the parties exchanged in order to facilitate their discussions or negotiations (*i.e.*, Evaluation Material).

Evaluation Material is a term that is central to, and defined in, the NDA. That term is specifically referred to by name throughout the agreement. Martin's interpretation of the NDA attempts to shoehorn "Evaluation Material" into language in Paragraph 3 that does not, and is not intended to, include "Evaluation Material." If the drafters of the NDA intended to include Evaluation Material within the category of information disclosable under Paragraph 3, they easily could have done that by referring directly to "Evaluation Material," as they did repeatedly elsewhere in the NDA.

The NDA also clearly distinguishes Evaluation Material from the disclosable information covered by Paragraph 3. Paragraph 4 addresses the disclosure of "any of the other party's Evaluation Material *or* any of the facts, the disclosure of which is prohibited under paragraph (3) of this letter agreement."[60] The disjunctive "or" plainly contradicts Martin's claim that Evaluation Material falls within the purview of Paragraph 3. And, the basic logic and structure of the NDA makes the trial court's reading the only reasonable one,

---

**58.** *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385–86 (Del.2012) (citing *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del.1998)); *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del.2012) (citing *E.I. du Pont de Nem-*

*ours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985)).

**59.** Italics added.

**60.** Italics added.

because Paragraph 2 (which precedes Paragraph 3) flatly prohibits the disclosure of Evaluation Material, and Paragraph 4 expressly mandates the conditions and procedures that must be complied with before Evaluation Material may be disclosed (assuming disclosure is otherwise "legally required").

We conclude, for these reasons, that the only reasonable construction of the NDA is that Paragraph 4 alone permitted the disclosure of Evaluation Material, and even then only if triggered by an External Demand and preceded by compliance with Paragraph 4's Notice and Vetting Process. The Court of Chancery found as fact that Martin disclosed Evaluation Material in the course of conducting its hostile bid, without having received an External Demand and without having engaged in the Notice and Vetting Process. Martin has not challenged that finding. We therefore uphold the Court of Chancery's determination that Martin breached the NDA's disclosure restrictions.

#### D. *The Remedy*

Lastly, Martin claims that the Court of Chancery reversibly erred in balancing the equities and granting injunctive relief to Vulcan without any evidence that Vulcan was threatened with, or suffered, actual irreparable injury. The injunction prohibited Martin, for a four month period, from going forward with its Exchange Offer and Proxy Contest, from otherwise taking steps to acquire control of Vulcan shares or assets, and from further violating the NDA and the JDA. As earlier noted, we review this claim for an abuse of discretion.[61]

 Martin's claim fails both legally and factually. It fails legally because, as the trial court noted, in Paragraph 9 of the NDA both parties stipulated that "money damages would not be [a] sufficient remedy for *any* breach ... by either party," and that "the non-breaching party *shall be entitled to equitable relief,* including injunction and specific performance, as a remedy for any such breach."[62] The JDA has a similar provision that obligates the parties to pursue "equitable or injunctive relief"—and *not* monetary damages—in the event of a breach of that agreement.[63]

Our courts have long held that "contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing ... injunctive relief."[64] Martin offers no persuasive reason why the parties' stipulation in the NDA that "money damages would not be [a] sufficient remedy for any breach" should not be regarded as a stipulation to irreparable injury, nor why the stipulation that "any breach ... shall entitle[ ]" the non-breaching party "to equitable relief" should not be given effect in this case. Nor does Martin persuade us that, although the JDA expressly disclaims any right to a money damages remedy, the harm imposed by a breach of that contract is not "irreparable" for injunctive purposes.[65]

**61.** *SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 40 (Del.1998) (holding that the grant of an injunction is reviewed "for abuse of discretion, but without deference to the legal conclusions of the trial court.").

**62.** Italics added.

**63.** JDA ¶ 10.

**64.** *Cirrus Holding Co. Ltd. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1209 (Del.Ch.2001); *see also, GTSI Corp. v. Eyak Tech., LLC,* 10 A.3d 1116, 1121, n. 1 (Del.Ch.2010); *Hexion Specialty Chems., Inc. v. Huntsman Corp.,* 965 A.2d 715, 762–63 (Del.Ch.2008); *True N. Commc'ns v. Publicis, S.A.,* 711 A.2d 34, 44 (Del.Ch.1997).

Martin's assertions also fail factually, because the Chancellor did make a finding of "actual"—and irreparable—injury. The trial court found, as fact, that "Vulcan is now suffering from exactly the same kind of harm Nye demanded the Confidentiality Agreements shield Martin [ ] from[;]" that Vulcan was injured by Martin's "contractually improper selective revelation of nonpublic Vulcan information[;]" and that Vulcan suffered a loss of "negotiating leverage." [66]

Unable to deny that the trial court so found, Martin shifts ground and asserts that any finding of harm was "speculative" and made "without any support." To the contrary, the adjudicated harm was not speculative and is supported by ample record evidence. For example, Vulcan's CEO James testified that when Martin revealed publicly the fact of the negotiations, "[i]t put us in play at a time that we would not have wanted to be put into play," because "this industry is in a recession." James also testified that "our employees were very concerned," and that "[o]ur executive team obviously is completely distracted from pursuing our internal strategic plan." That and other non-speculative record evidence solidly supports the Court of Chancery's finding of "actual" irreparable injury.

Martin also attacks the scope of the remedy itself, claiming that the injunction was unreasonable because it would delay Martin's Proxy Contest by one year, rather than four months. In different circumstances that kind of harm might be a legally cognizable factor that a court will take into account in balancing the equities for and against granting an injunction. Here, however, the "delay" is attributable to the NDA's May 3, 2012 expiration date, which—when combined with Vulcan's advance notice bylaw [67]—precluded Martin from disclosing Vulcan confidential information to support its Proxy Contest in time for Vulcan's 2012 annual meeting. Because New Jersey law requires director elections to be held annually,[68] the practical reality was that Martin's first opportunity to disclose that information lawfully to promote a Proxy Contest would not occur until 2013.

Given those facts, the Court of Chancery did not abuse its discretion by holding that the equities favored Vulcan, because "Martin's breaches prevented Vulcan from seeking injunctive relief before the confidential information was made public" and Vulcan "[had] been measured in its request for injunctive relief." [69] The court properly balanced the need to "vindicat[e] Vulcan's reasonable [contractual] expectations" against the "delay" imposed on Martin as a "result of its own conduct." [70] The Chancellor stated that although "an argument can be made that a longer injunction would be justified by the pervasiveness of Mar-

**65.** *See, e.g., Gradient OC Master, Ltd. v. NBC Universal, Inc.,* 930 A.2d 104, 131 (Del.Ch. 2007) ("There is no irreparable harm if money damages are adequate to compensate [the plaintiff] . . . .") (citations omitted); *see also, El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.,* 669 A.2d 36, 39 (Del.1995) ("[E]quity operates only in the absence of an adequate remedy elsewhere. . . .").

**66.** *Martin Marietta Materials, Inc. v. Vulcan Materials Company,* 56 A.3d 1072, 1144–46 (Del.Ch.2012).

**67.** Amended and Restated By–Laws of Vulcan Materials Company, Article 1, Section 1.04.

**68.** N.J. Stat. Ann. § 14A:5–2.

**69.** *Martin Marietta Materials, Inc.,* at 1146–47.

**70.** *Id.*

tin['s] breaches," an injunction lasting four months was "a responsible period" reflecting the time interval between when Martin launched its Exchange Offer on December 12, 2011, and the NDA's May 3, 2012 expiration date. That this measured form of relief also resulted in delaying Martin for a longer period from seeking to replace the Vulcan board, does not detract from the propriety of the relief the court granted.

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is affirmed.