# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BluSky Restoration Contractors, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2025-0726-DH |
| John David Robbins and Christopher J. Popwell, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPORT

Report:  March 4, 2026
Date Submitted: January 12, 2026

John T. Miraglia, Brian M. Rostocki, REED SMITH  LLP*,* Wilmington, Delaware; Adam Massaro, REED SMITH LLP, Denver, Colorado; *Attorneys for Plaintiff BluSky Restoration Contractors, LLC*.

Aaron R. Sims, Ryan M. Crowley, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Timothy K. Garrett, Hunter K. Yoches, BASS, BERRY & SIMS PLC, Nashville, Tennessee; *Attorneys for Defendants John David Robbins and Christopher J. Popwell*.

**HUME, IV, M.**

The parties' squabble is a classic one. One side seeks to uphold restrictive covenants while the other side argues the covenants' overbreadth. Plaintiff is a nationwide restoration firm that purchased the Defendants' regional restoration business in Tennessee. The sale agreement, along with a contemporaneous employment agreement and subsequent incentive unit agreement, all contained restrictive covenants. Plaintiff alleges that Defendants have violated the restrictions and breached those agreements. Plaintiff seeks a preliminary injunction. Defendants counter that the restrictive covenants are unenforceable, and that Plaintiff's claims should be dismissed. I address the Motion to Dismiss first because if the restrictive covenants are deemed unenforceable then the preliminary injunction cannot succeed. For the reasons below, I find the restrictive covenants unenforceable and grant the Defendants' Motion to Dismiss.

## I.   BACKGROUND[1]

Plaintiff BluSky Restoration Contractors, LLC ("BluSky" or Plaintiff) is a national restoration contractor "with locations coast to coast."[2]   This includes 60 corporate and regional offices in 27 states.[3]   BluSky provides commercial and residential "mitigation, construction, renovation, general contracting, environmental, roofing and catastrophe response services."[4]   This includes "industrial, healthcare, multi-family, governmental, and residential sectors."[5] Defendants John David Robbins ("Robbins") and Christopher J. Popwell ("Popwell")[6] co-founded Sharp, Robbins & Popwell, LLC ("SRP"), a Tennessee-

---

[1] I draw the following facts from the Amended Verified Complaint (Docket Item ("D.I.") 51 [hereinafter "Am. Compl."])  and Exhibits attached thereto.   I refer to the parties' briefing as follows: OB (Opening Brief in Support of Motion for Preliminary Injunction), AB (Defendant's Omnibus Answering Brief to Plaintiff's Motion for Preliminary Injunction and Opening Brief to Its Motion to Dismiss), RB (Plaintiff's Combined Answering Brief in Opposition to Defendant's Motion to Dismiss and Reply Brief in Further Support of Plaintiff's Motion for Preliminary Injunction), and SRB (Defendant's Reply Brief in Further Support of Their Motion to Dismiss).  A final transcript has not been completed as of this writing, so references to the Draft Transcript are listed as "Draft.Tr. _. For purposes of the Motion to Dismiss, I do not consider facts found in the Motion for Preliminary Injunction, responses to the Motion or any exhibits thereto.

[2] Am. Compl. ¶ 2.

[3] *Id.* ¶ 40.

[4] *Id.* ¶ 2.

[5] *Id.*

[6] Robbins and Popwell will also be referred to collectively as Defendants.

based restoration and mitigation business.[7]  Robbins and Popwell were SRP's Vice Presidents and oversaw SRP's operations, finances, and strategy.[8]

### A. BluSky Acquires SRP in 2019 and Defendants Sign the Equity Purchase Agreement.

On December 20, 2019, BluSky acquired SRP through an Equity Purchase Agreement ("EPA") for a purchase price described in the "tens of millions."[9] BluSky integrated SRP's business into its national platform.[10]  The EPA contained restrictive covenants covering non-competition and non-solicitation for Robbins and Popwell.[11]

### B. Defendants Become BluSky Employees and Sign Employment Agreements

That same day, Robbins and Popwell also entered into Employment Agreements ("EA") with BluSky.[12]  Robbins accepted a role as Senior Vice President and Popwell obtained a position as Regional Vice President.[13]  Robbins' position included mitigation, expansion of the healthcare portion of BluSky's

---

[7] Am. Compl. ¶ 3

[8] *Id.* ¶ 5.

[9] *Id.* ¶¶ 4, 49; Am. Compl. Ex. A.

[10] Am. Compl. ¶ 55.

[11] *Id.* ¶¶ 6, 64.

[12] Am. Compl. Ex. B and C.  Robbins' and Popwell's Employment Agreements are similar and will be referred to jointly.

[13] Am. Compl. ¶ 52.

business, and strategic training.[14] Popwell's capacity included "all aspects of business in BluSky's midsouth region."[15] The EAs contained non-competition, non-solicitation, and confidentiality provisions.[16]

### C. BluSky's Parent, KPSKY, Grants Incentive Units to Defendants in an Agreement Containing Restrictive Covenants

After SRP's purchase in 2019, Robbins and Popwell worked for BluSky for almost five years.[17] In 2022, BluSky's parent, KPSKY[18], conferred 396 Incentive Units on Robbins and 795 Incentive Units on Popwell (the KPSKY Agreements).[19] The KPSKY Agreements contained a Restrictive Covenants Agreement (the "RCAs").[20] The RCAs contained non-competition, non-solicitation, and confidentiality restrictions, including return of materials.[21]

---

[14] *Id.* ¶ 53.

[15] *Id.* ¶ 54.

[16] Am. Compl. Ex. B and C, §§ 6 and 5, respectively.

[17] Am. Compl. ¶ 61.

[18] *Id.* ¶ 2. BluSky is an indirect, wholly owned subsidiary of KPSKY Holdings L.P.

[19] *Id.* ¶ 76.

[20] *Id.* ¶ 77; Am. Compl. Ex. D and E. Robbins' and Popwell's KPSKY Agreements and RCAs are similar and will be referred to jointly.

[21] Am. Compl. Ex. D and E §§6, 5, and 1.

**D.    Defendants Leave BluSky and Form Midsouth Property Maintenance**

Robbins and Popwell submitted their resignations on September 11, 2024.[22] Robbins's last day was to be November 1; Popwell's was October 18.[23] They formed their new entity, Midsouth Property Maintenance, LLC (MPM), on or about October 3, 2024.[24] MPM is a Tennessee limited liability company that provides restoration, recovery, and environmental services to damaged properties.[25] MPM has offices in Tennessee and offers services similar to BluSky's.[26] Defendants retained thousands of BluSky files after they resigned from the company.[27]

**E.    Procedural Posture**

BluSky filed a Verified Amended Complaint on October 2.[28] BluSky alleged breach of contract against Robbins and Popwell (Counts I and II, respectively) for violating the non-competition and non-solicitation provisions of the EPAs.[29] It sought injunctive relief prohibiting Robbins and Popwell from "operating Midsouth

---

[22] Am. Compl. ¶ 85.

[23] *Id.*

[24] *Id.* ¶ 86.

[25] *Id.* ¶19.

[26] *Id.* ¶¶ 19–20.

[27] *Id.* ¶22.

[28] D.I. 51.

[29] Am. Compl. ¶¶ 93–99, 102–08.

Property in the same restoration industry and geographic areas as BluSky or soliciting BluSky's current, recent, and prospective customers for the restrictive period of two years", or compensatory damages in the alternative.[30] Counts III and IV claimed Robbins and Popwell violated the non-competition, non-solicitation and non-disclosure conditions in the EAs by Robbins and Popwell.[31] BluSky again sought injunctive relief or compensatory damages for these infractions.[32] Finally, Counts V and VI alleged that Defendants defied the non-competition, non-solicitation, confidentiality, and "Return of Materials" provisos in the KPSKY RCAs.[33] As with the other counts, BluSky sought injunctive relief or compensatory damages.[34]

BluSky filed a Motion for Preliminary Injunction and Opening Brief in support thereof on October 13.[35] BluSky claimed that Defendants violated the restrictive covenants in the EPAs, the EAs, and the RCAs. It sought to enjoin Defendants from using or disclosing confidential BluSky information, from

---

[30] *Id.* ¶¶ 100–01, 109–10. BluSky conceded at oral argument that the restrictive covenants have lapsed, so it can no longer seek injunctive relief. Draft Tr. 47:7-13.

[31] Am. Compl. ¶¶ 111–18, 121–28.

[32] *Id.* ¶¶ 119–20, 129–30.

[33] *Id.* ¶¶ 131–38, 141–48.

[34] *Id.* ¶¶ 139–40, 149–50.

[35] D.I. 57.

soliciting BluSky customers and employees, and using MPM to compete unfairly with BluSky.[36]   On October 15, Robbins and Popwell filed a Motion to Dismiss the Verified Amended Complaint.[37]   Combined briefing on the Motion for Preliminary Injunction and Motion to Dismiss took place.[38]   Defendants argued that the breach of contract counts should be dismissed because the restrictive covenants are unenforceable.[39]   Robbins and Popwell contended that the restrictive covenants do not protect any legitimate BluSky business interest and are overly broad in geographic, temporal, and substantive scope.[40]   Defendants urged the Court to resist the urge to blue pencil any unenforceable provisions.[41]   Because the restrictive covenants were unenforceable, Defendants maintained that BluSky could not show a reasonable probability of succeeding on the preliminary injunction.[42]   Conversely, BluSky insisted that the confidentiality provisions and non-competes and non-solicits were enforceable and not nearly as broad as Defendants would lead the Court

---

[36] OB at 3–4.

[37] D.I. 58.

[38] D.I. 57, 62, 67, 70, 72.

[39] AB at 32.

[40] *Id.* at 33, 35.

[41] *Id.* at 37.

[42] *Id.* at 38.

to believe.[43] BluSky proposed that the Court could blue pencil any overly-broad provisions given the consideration paid and Defendants' legal representation and awareness of the restrictions.[44] The Court heard argument on both motions on January 12, 2026.

## II. ANALYSIS

### A. Robbins and Popwell's Motion to Dismiss.

Defendants move to dismiss the Verified Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[45] The standard for a Rule 12(b)(6) motion is familiar to the parties: "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless 'the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'" *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citing *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

---

[43] *See* RB.

[44] RB at 39

[45] D.I. 58.

The reasonable conceivability standard grants a plaintiff "all reasonable inferences that logically flow from the face of the complaint" but does not obligate the Court "to accept every strained interpretation of the [plaintiff's] allegations." *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). The Court will "ignore conclusory allegations that lack specific supporting factual allegations." *FMLS Hldg. Co. v. Integris BioServices, LLC*, 2023 WL 7297238, at *5 (Del. Ch. Oct. 30, 2023) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).

## B.     The EPA is Unenforceable Because of its Overbreadth.

The Court declines to mechanically enforce restrictive covenants, instead subjecting them to increased scrutiny because they are "restrictive of trade." *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977). Rather, the covenants must meet the following three-element test: (1) The restrictive covenants have reasonable temporal and geographic scope; (2) the covenants advance the legitimate economic interest of the party seeking their enforcement; and (3) the covenants survive a balancing of the equities. *Kodiak Building Partners, LLC v. Adams*, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022). The restrictive covenants in the EPA arose as part of BluSky's purchase of SRP. Restrictive covenants are subject to a less searching inquiry in the sale of a business than in an employment contract. *Tristate Courier and Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10

10

(Del. Ch. Apr. 15, 2004). "Although relatively broad restrictive covenants have been enforced in the sale of a business context, such covenants must be tailored to the competitive space reached by the seller and serve the buyer's legitimate economic interests." *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023) (citations omitted).

### 1. The EPA Non-Compete

BluSky alleges Defendants improperly competed by "diverting customers to a known competitor" and by operating MSM, a direct competitor of BluSky in the same geographic area in which Robbins previously served as a senior manager for BluSky.[46] The EPA Non-Compete provision is found at section 5.04(a)(iii):

(a) In consideration of the transactions contemplated by this Agreement, during the period from the Closing Date to the date that is five (5) years after the Closing Date, each Seller shall not, and shall cause their respective Affiliates not to:

(iii) directly or indirectly (including as a proprietor, principal, agent, partner, officer, director, equityholder, employee or otherwise) (A) operate, engage in (or assist others to engage in), consult with, acquire, participate in, provide services to, be employed by, manage, control or own (or participate in the management, control or ownership of), or hold any Competing Business anywhere in the Restricted Area or (B) acquire (through merger, stock purchase or purchase of all or substantially all of the assets or otherwise) the ownership of, or any equity interest in, any Person unaffiliated with the Company Group if such Person derives revenues of five percent (5%) or more from any Competing Business and, provided, that such Person shall not, at any

---

[46] Am. Compl. ¶ 96.

time, derive revenues of five percent (5%) or more from any Competing Business.

"Company Group" is defined as "the Company and any of its Subsidiaries."[47] The "Restricted Area" is "anywhere in the world."[48] "Competing Business" is "any Person, business, or subdivision of a business of the type and character engaged in the Business or any such persons which is actively planning to engage in the Business."[49]

"Restrictive covenants in connection with the sale of a business legitimately protect only the purchased asset's goodwill and competitive space that its employees developed or maintained." *Kodiak Building P'rs, LLC v. Adams*, 2022 WL 5240507, at *10 (Del. Ch. Oct. 6, 2022) (citations omitted). The purpose of the non-compete is to protect BluSky's interest in SRP's goodwill and competitive space. SRP was Tennessee-based.[50] Thus, BluSky has a legitimate protective interest in the regional footprint of SRP (the mid-south region). BluSky integrated SRP into its national platform.[51] BluSky paid "tens of millions" to protect its investment in SRP. But the EPA non-compete provisions go far beyond BluSky's legitimate business interests

---

[47] EPA section 1.01. The "Company" is SRP. *See* Preamble to the EPA.

[48] EPA section 1.01.

[49] *Id.*

[50] Am. Compl. ¶ 3.

[51] *Id.* ¶ 55.

in SRP's goodwill and business footprint. SRP was a regional business. Yet the EPA prevents Defendants from competing with BluSky worldwide. The Verified Amended Complaint notes that "[d]efendants were prohibited from competing, directly or indirectly, or assisting another to compete, with any of BluSky's business lines."[52] BluSky's business lines are nationwide. Again, this is well outside the bounds of BluSky's legitimate business interest in SRP's regional span. A worldwide ban is beyond even BluSky's nationwide business footprint. BluSky points the Court to the EPA's provision where the Defendants acknowledge that the restrictive covenants are reasonable in scope, duration, and geography.[53] But this Court has shunned perfunctory acceptance of these arrangements. Restrictions on competition are matters of public policy and require the Court "to evaluate noncompetition and non-solicitation contracts holistically, carefully, and nonmechanically, with an eye towards reasonableness, equity, and the advancement of legitimate business interests." *Kodiak Building P'rs, LLC*, 2022 WL 5240507, at *8 (Del. Ch. Oct. 6, 2022); *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783 (Del. Ch. Mar. 27, 2020). Defendants' contractual stipulation to the reasonableness of the restrictive covenant's scope cannot compel the Court to admit its

---

[52] Am. Compl. ¶ 65.

[53] EPA § 5.05.

reasonability.  The EPA's non-compete goes beyond BluSky's legitimate business interests in SRP and is unreasonable.

I next turn to whether the temporal and geographic scope of the EPA non-compete was reasonable.  Courts consider the interplay between restrictions "synergistically" and "'a court must consider how the temporal and geographic restrictions operate together'" because the "'two dimensions necessarily interact.'" *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 753 (Del. 2023) (quoting *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011)).  That interaction means that "a longer restrictive covenant will be more reasonable if geographically tempered, and a restrictive covenant covering a broader area will be more reasonable if temporally tailored." *Del. Elevator, Inc.*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011).  The EPA restrictive covenants were for a period of five years.[54]  The geographic scope was worldwide.  This Court's reasoned analysis in *Intertek* serves as guidance.  There, the Court found a similar five-year worldwide non-compete unenforceable due to the incongruity between the provision's worldwide geographic scope and the acquired business' national service area. *Intertek Testing Services NA*, 2023 WL 2544236, at *4.  Here, the restricted area is worldwide.  BluSky's business lines are nationwide.  Yet SRP's sphere was only

---

[54] EPA ¶ 5.04.

14

regional. Under the circumstances, a five-year limitation with these discordant physical boundaries is unjustified. The EPA non-compete is unreasonable based on its geographic and temporal overbreadth.

The non-compete does not survive a balancing of the equities. BluSky argues that Defendants were "paid tens of millions" and "handsomely compensated" in the SRP purchase.[55] That is a significant sum. But is it substantial consideration? I look again to *Intertek* on balancing the equities. There, the seller received ten million dollars for his business interest. *Intertek*, 2023 WL 2544236, at *1. But the non-compete reached markets not served by the acquired business." *Id.*, at *4. Where BluSky's argument falls short is that the "tens of millions" compensated Defendants for SRP's goodwill and competitive space, not BluSky's. BluSky does not suggest that SRP was a national company. It was not. BluSky paid for SRP's regional reach. That was worth "tens of millions." But that amount does not compensate Defendants for the overbroad non-compete in the EPA that covers vast territory outside of SRP's reach. Even in a sale of the business context, it is unenforceable.

---

[55] Am. Compl. ¶ 49

## 2. The EPA Non-Solicits

BluSky argues that Defendants violated the EPA non-solicits when they actively solicited BluSky customers.[56] The EPA contained non-solicitation restrictions. Those read as follows:

(a) In consideration of the transactions contemplated by this Agreement, during the period from the Closing Date to the date that is five (5) years after the Closing Date, each Seller shall not, and shall cause their respective Affiliates not to:

(i) either alone or in concert with others, directly or indirectly, (A) recruit or hire or otherwise solicit for employment (or assist any other Person unaffiliated with the Company Group in engaging in any such activities), any Person who is or within the twelve (12) month period immediately prior to the Closing Date, was an employee or independent contractor of any member of the Company Group or (B) otherwise induce or attempt to induce (or assist any other Person unaffiliated with the Company Group in engaging in any such activities) any employee of the Company or any of its Subsidiaries to terminate such Person's employment with Purchaser or its Affiliates, or tortiously interferes with the relationship between Purchaser and its Affiliates, on the one hand, and any such employee, officer or director on the other hand;

(ii) directly or indirectly, on its or their own behalf or on behalf of any other Person unaffiliated with the Company Group, (A) persuade or attempt to persuade, any customer or client or potential customer or client of the Company Group to which a member of the Company Group has made a presentation, or with which a member of the Company Group has had discussions (each, a "Customer"), not to hire Purchaser or its Affiliates or to hire another company in relation to the goods and services provided by the Business, (B) in any way intentionally or knowingly interfere with the relationship between Purchaser or any of its Affiliates and any Customer or business

---

[56] *Id.* ¶¶ 96, 105.

16

relationship, or (C) solicit or induce any Customer of Purchaser or any of its Affiliates to purchase goods or services from a Competing Business in competition with the Company, the Purchaser or any of its Affiliates or to aid any Competing Business in identifying or soliciting any such Customer; provided, however, that the foregoing restriction shall not apply with respect to any performance duly requested with the approval by the board or similar governing entity of the Company Group, Purchaser or any of their respective Affiliates

As with the non-compete, Defendants take issue with the non-solicits' legitimate business and geographic scopes.[57] Defendants claim that they exceed SRP's business sphere and service area.[58] BluSky counters that the non-solicits are appropriately measured to SRP's business footprint.[59]

Like the EPA non-compete, the scope of the EPA non-solicit is broader than reasonable geographically and to protect BluSky's legitimate business interest in SRP. Geographically, the non-solicit for both customers and employees contains no geographic limitations. This lack of limitation, especially when considering SRP's regional nature, is unreasonable.

The non-solicit contains other provisions that are not tailored to BluSky's legitimate business interest. The employee non-solicit contains language prohibiting "an attempt to induce" an employee from terminating its relationship with BluSky

---

[57] AB at 51.

[58] *Id.*

[59] RB at 37.

17

and its Affiliates.[60]  The non-solicit for customers similarly prohibits an "attempt to persuade" any customer or client not to hire BluSky or its affiliates.[61]  This Court has found similar bans to be "fatally overbroad" because they capture non-competitive conduct.  *BankUnited, N.A. v. Shulick*, 2026 WL 21637, at *9 (Del. Ch. Jan. 2, 2026); *see HKA Global, LLC v. Beirise,* 2025 WL 3639811, at *5 (Del. Ch. Dec. 16, 2025).  The EPA non-solicits are unenforceable due to this "attempt" overbreadth.

The non-solicits suffer from parallel afflictions based on their inclusion of "affiliates."  The EPA defines "Affiliates" of a Person as:

> any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise[62]

Defendants argue that this addition encompasses not just SRP and BluSky, but the children of those covered (for the sellers) and the upstream and downstream affiliates

---

[60] EPA § 5.04(a)(i).

[61] *Id.* § 5.04(a)(ii).

[62] *Id.* § 1.01.

of BluSky.[63]   BluSky counters that "affiliates" is prefaced by conditions that appropriately and reasonably limit applicability.[64]   It argues that the contract language limits it to SRP customers, contains a scienter requirement, and limits the scope of affiliates by incorporating the phrase, "from a Competing Business."[65]

"Including affiliates in a restrictive covenant greatly expands the covenant's breadth, and therefore requires a broader legitimate economic interest." *Fortiline, Inc. v. McCall*, 2024 WL 4088629, at *4 (Del. Ch. Sep. 5, 2024) (citing *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *18 (Del. Ch. Jan. 4, 2023), *rev'd on other grounds*, 312 A.3d 674 (Del. 2024)).   Affiliates as defined in the EPA include the Defendants' children.[66]   This Court has found similar restrictions that include a person's child to be excessive and unreasonable.  *Sunder Energy, LLC,* 305 A.3d at 756–57 (Del. 2023).   Affiliates would also include other businesses controlled by Defendants but outside the business area of BluSky, and other affiliates of BluSky in its corporate structure.   For instance, if Robbins was also owner of a company that produced paper products, and an employee at that company suggested that a friend who worked at a paper company in BluSky's corporate structure quit

---

[63] AB at 48–50.

[64] RB at 37–38.

[65] *Id.* at 38 (citing EPA §5.04(ii)(c)).

[66] "[A]ny other Person directly or indirectly . . . controlled by . . . such Person."  EPA § 1.01.

her job for a better offer, that would be violative conduct under the EPA non-solicit. This exemplifies the overbreadth created by the affiliate addition.

The customer non-solicit is similarly problematic. Taking our same hypothetical employee at Robbins' paper company, if her next door neighbor is seeking restoration services and the Robbins employee, unaware that SRP made a presentation to the neighbor, suggests a competitor for the restoration, that would violate the customer non-compete. These seemingly isolated hypotheticals show the danger that this Court confronted in *Fortiline*—shielding unspecified and unrelated affiliates increases the threat that the restricted party will unknowingly violate the letter of the covenant. *Fortiline, Inc.*, 2024 WL 4088629, at *4. That is the risk with an overly broad restriction and why such restraints are unenforceable.

The balance of the equities analysis for the non-solicits is identical to that of the non-compete. BluSky paid "tens of millions" for SRP. But it is not the amount paid that controls. There is not a bright line amount that triggers the Court to find a restriction reasonable. The non-solicits are intended to protect BluSky from tampering with its employees or from tampering with SRP's customers. But the affiliate language makes the restrictions far broader than necessary, and more than what is reasonable based on the purchase price. The balance of equities favors Defendants. The EPA non-solicitation provisions are unenforceable.

20

**C.** **The EAs are similarly unenforceable because the geographic scope temporal duration, and substantive reach are overbroad.**

When BluSky purchased SRP, Defendants entered into the EAs to become BluSky employees.[67] Robbins became a Senior Vice President and Popwell became a Regional Vice President.[68] Indeed, the EPA and EAs were signed the same day.[69] Yet each EA is a contract separate from the EPA. They have their own consideration and different temporal limits than the EPA.[70] Defendants were each paid $300,000 annually, plus the ability to earn bonuses.[71]

**1. The EA Non-Compete[72]**

The non-competition portion of the EAs reads as follows:

> 6. <u>Non-Competition and Non-Solicitation</u>. Executive acknowledges that in the course of Executive's employment with the Employer and its Subsidiaries, Executive has, and will continue to, become familiar with the Employer's and its Subsidiaries' Trade Secrets and with other Proprietary Information concerning the Employer and its Subsidiaries and that Executive's services have been and will be of special, unique and extraordinary value to the Employer and its Subsidiaries. Therefore, in further consideration of the compensation to be paid to Executive hereunder, Executive agrees that, without limiting any other obligation pursuant to this Agreement:

---

[67] Am. Compl. ¶ 7.

[68] *Id.*

[69] Am. Compl. Ex. A–C.

[70] *Id.* Ex. B–C.

[71] *Id.* §3.

[72] Robbins' and Popwell's Employment Agreements are identical regarding the non-compete, non-solicit, and confidentiality portions, so I will refer to them jointly.

(a) Non-Compete. During the period that Executive is employed with or engaged by the Employer or any of its Subsidiaries and for a period thereafter of twenty-four (24) months (collectively, the "Protection Period"), Executive shall not directly or indirectly (including as a proprietor, principal, agent, partner, officer, director, equityholder, employee or otherwise), either for Executive or for any other Person, (i) operate, engage in (or assist others to engage in), consult with, acquire, participate in, provide services to, be employed by, manage, control or own (or participate in the management, control or ownership of), or hold any Competing Business anywhere in the Restricted Territory or (ii) acquire (through merger, stock purchase or purchase of all or substantially all of the assets or otherwise) the ownership of, or any equity interest in, any Person unaffiliated with the Employer and its Subsidiaries if such Person derives revenues from any Competing Business. Nothing herein shall prohibit Executive from owning not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Executive is merely a passive investor and has no active participation in the business of such corporation.[73]

"Restricted Territory" means:

any state, province or territory in the United States or any other country in which the Employer or any of its Subsidiaries engages in the Business or actively plans to engage in the Business during the Employment Period (or, if the challenged activity occurs following the termination of Executive's employment, then as of the last day of such employment or at any time during the twelve (12) months preceding such date).[74]

"Subsidiary" includes:

---

[73] EA § 6(a)

[74] *Id.* § 22.

any Person of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by the Employer or one or more of the other Subsidiaries of the Employer or a combination thereof or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by the Employer or one or more Subsidiaries of the Employer or a combination thereof and for this purpose a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation). For the purposes hereof, the term Subsidiary shall include all Subsidiaries of such Subsidiary.

The non-compete lasts for two years after Defendants separate from BluSky and is at least nationwide in geographic scope. "Restricted Territory" is anywhere that BluSky or its subsidiaries do business. BluSky presents a unique argument on the restrictive covenants in the EA. BluSky contends that the EAs were executed as part of the sale.[75] At the same time, it argues that BluSky is not limited to their legitimate interest in the SRP purchase because of the employment context. BluSky's distilled argument is that it fully benefits from the less searching inquiry

---

[75] The EAs appear to be more consistent with freestanding employment agreements. They are documents separate from the EPA and provide for separate consideration. The only connection to the EPA appears to be timing. The EPA and EAs were signed on the same date. Still, BluSky alleges that they were part of the SRP sale, so I will consider them as such for purposes of this decision.

in the context of a business sale, but it also reaps the expanded footprint of a standalone employment contract. *Tristate Courier,* 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004). But BluSky cannot have it both ways. When restrictive covenants are part of the sale of a business, the acquiror's legitimate business interest is the acquired company's competitive reach. *Intertek*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023). As with the EPA, the Court must consider how the restrictive covenant's facets work together. *Sunder Energy, LLC*, 305 A.3d at 753 (Del. Ch. 2023) ("A covenant that restricts employment in a similar industry for two years might be reasonable if it only applies within a single town or county, and vice versa. All else equal, a longer restrictive covenant will be more reasonable if geographically tempered, and a broader restrictive covenant will be more reasonable if temporally tailored.").

The EA non-compete suffers from some of the same maladies as the EPA non-compete. Although shorter, it also provides substantially less consideration. It far exceeds SRP's competitive space. SRP was a regional company. BluSky extols its business reach as coast to coast. The rationale for limiting BluSky's reach to SRP's competitive space is the same here as it was for the EPA. In the sale of a business context, BluSky has no legitimate business interest in protecting itself from competition in the many areas that SRP did not serve. Like the EPA non-compete, the EA non-compete is overly broad and unenforceable.

24

The balance of the equities analysis varies slightly from that with the EPA. Plaintiff claims that the EAs were made as part of the sale of the business. But the EAs have separate consideration, so the "tens of millions" consideration argument is inapplicable. Each EA awarded Defendants a salary of $300,000 per year plus the possibility of integration bonuses in 2020 and 2021 and annual bonuses beginning in 2020. This consideration does not compensate Defendants as C-suite executives and BluSky makes no argument that they are C-suite executives. But like the EPA, in the sale of a business, the acquiror is paying for the goodwill and business space of the seller. The EAs compensate Defendants for those, but the geographic, temporal, and legitimate business interests far exceed SRP's reach. The compensation is befitting regional executives but is not commensurate with a nationwide ban on competition. The balance of the equities weighs in favor of Defendants. The EA non-compete is unenforceable.

## 2. The EA Non-Solicit

The EA non-solicit derives from the following in the Employment Agreements:

> 6. Non-Competition and Non-Solicitation. Executive acknowledges that in the course of Executive's employment with the Employer and its Subsidiaries, Executive has, and will continue to, become familiar with the Employer's and its Subsidiaries' Trade Secrets and with other Proprietary Information concerning the Employer and its Subsidiaries and that Executive's services have been and will be of special, unique and extraordinary value to the Employer and its Subsidiaries. Therefore, in further consideration of the

25

compensation to be paid to Executive hereunder, Executive agrees that, without limiting any other obligation pursuant to this Agreement:

(b) Non-Solicitation of Employees. During the Protection Period, Executive shall not directly or indirectly through another Person (other than on behalf of the Employer and its Subsidiaries) (i) recruit or hire or otherwise solicit for employment (or assist any other Person unaffiliated with the Employer and its Subsidiaries in engaging in any such activities), any Person who is (or, if the challenged activity occurs following the termination of Executive's employment, then as of the last day of such employment or at any time during the twelve (12) months preceding such date was) an employee or independent contractor of the Employer and its Subsidiaries or (ii) otherwise induce or attempt to induce (or assist any other Person unaffiliated with the Employer and its Subsidiaries in engaging in any such activities) any employee of the Employer or any of its Subsidiaries to terminate such Person's employment with the Employer, its Subsidiaries or their Affiliates, or in any way interfere with the relationship between the Employer, its Subsidiaries and their Affiliates, on the one hand, and any such employee, officer or director on the other hand.

(c) Non-Solicitation of Customers. During the Protection Period, Executive shall not directly or indirectly through another Person (other than on behalf of the Employer and its Subsidiaries) (i) persuade or attempt to persuade, any customer or client or potential customer or client of the Employer and its Subsidiaries to which any such entity has made a presentation, or with which any such entity has had discussions during the Employment Period (or, if the challenged activity occurs following the termination of Executive's employment, then as of the last day of such employment or at any time during the twelve (12) months preceding such date was) (each, a "Customer"), not to hire the Employer, its Subsidiaries or their Affiliates or to hire another company in relation to the goods and services provided by the Business, (ii) in any way intentionally or knowingly interfere with the relationship between the Employer, its Subsidiaries or their Affiliates and any Customer or business relationship or (iii) solicit or induce any Customer of the Employer, its Subsidiaries or their Affiliates to purchase goods or services anywhere in the Restricted Territory from a Competing Business in competition with the Employer, its Subsidiaries or their Affiliates or to aid any Competing Business in identifying or

26

soliciting any such Customer; provided, however, that the foregoing restriction shall not apply with respect to any performance requested by or for the direct benefit of the Employer, its Subsidiaries or their Affiliates.

The non-solicit has a two-year duration.  It has at least a nationwide reach because it tracks BluSky's subsidiaries and affiliates.  BluSky is nationwide, but the definition of "Affiliates", as explained below, expands the sphere even further.  Like the EA non-compete, BluSky tries to find refuge in the argued duality of the EA being both in the context of a sale and a separate employment agreement.  But the law provides BluSky no haven.  Even if the EAs are made in the sale of a business context, then BluSky's legitimate business interest is in protecting the assets, goodwill, and competitive business space it purchased from SRP.  *Kodiak*, 2022 WL 5240507, at \*9 ("When [buyer] purchased [seller], it purchased [seller's] assets, including its goodwill.  As explained, Delaware law recognizes [buyer] has a legitimate economic interest in protecting what it purchased from [seller].").  Since the non-solicit applies far beyond SRP's competitive space, it does not advance BlueSky's legitimate economic interest in the purchased company and is unreasonable.

27

As with the EPA, the non-solicits contain similar fatally overbroad language about attempting to induce (employees)[76] or attempting to persuade (customers).[77] *BankUnited, N.A. v. Shulick*, 2026 WL 21637, at *9. (Del. Ch. Jan. 2, 2026); *see HKA Global, LLC v. Beirise,* 2025 WL 3639811, at *5 (Del. Ch. Dec. 16, 2025). The non-solicits are unenforceable on this basis.

Like the non-solicit in the EPA, the EA non-solicit also includes "affiliates" in coverage for both employees and customers. "Affiliate" as defined in the EA:

> means, with respect to the Employer and its Subsidiaries, any other Person controlling, controlled by or under common control with the Employer or any of its Subsidiaries and, in the case of a Person which is a partnership, any partner of the Person. Notwithstanding anything to the contrary in this Agreement, Executive shall not be deemed an Affiliate of the Employer or any of its Subsidiaries.[78]

The definition includes both upstream and downstream entities. Plaintiffs argue that despite the presence of "affiliates" in the EA non-solicits, the language of the non-solicits reasonably limits applicability.[79]

---

[76] EA § 6(b).

[77] *Id.* § 6(c).

[78] *Id.* § 22.

[79] AB at 30–33.

The non-solicit for employees prohibits Defendants from recruiting, hiring, or soliciting for employment any BluSky or BluSky subsidiary employee or independent contractor (hereinafter "employees") or inducing or attempting to induce employees to terminate their employment with BluSky, BluSky subsidiaries, or BluSky affiliates. Plaintiff contends that this only prohibits Defendants from seeking out BluSky or BluSky subsidiary employees. That argument ignores that affiliates refers to terminating employment with BluSky affiliates and unnecessarily expands the covered pool to BluSky affiliate employees. This is unreasonably overbroad and unenforceable.

The non-solicit for customers also suffers under the weight of affiliate overbreadth. The customer non-solicit prohibits Defendants from persuading or attempting to persuade any BluSky or BluSky subsidiary customer or client where BluSky has had discussions or made a presentation not to hire BluSky or its affiliates or to hire another company for goods and services provided by BluSky. The next clause[80] prevents Defendants from intentionally or knowingly interfering with the relationship between BluSky, BluSky subsidiaries, or their affiliates and any customer or business relationship. The final clause prohibits Defendants from soliciting or inducing a customer of BluSky, BluSky subsidiaries, or BluSky

---

[80] EA § 6(c.)(ii.).

29

affiliates to purchase goods or services anywhere nationwide from a competitor of BluSky, its subsidiaries, or affiliates, or to aid competitors in identifying or soliciting customers.[81]

The problem with each of these clauses is that they were made in the context of the sale of SRP to BluSky. The inclusion of BluSky's affiliates, upstream, downstream, and nationwide, expand BluSky's business interest far beyond what could be considered reasonable for the SRP purchase. This is illustrative of the danger that this Court discussed about including affiliates and other corporate business lines in a restrictive covenant. *Fortiline v. McCall,* 2024 WL 4088629, at *4–5 (Del. Ch. Sept. 5, 2024); *Hub Gp. Inc. v. Knoll¸* 2024 WL 3453863 (Del. Ch. Jul. 18 2024); *Ainslie v. Cantor Fitzgerald, L.P.,* 2023 WL 106924, at *18 (Del. Ch. Jan. 4, 2023), *rev'd on other grounds*, 312 A.3d 674 (Del. 2024). "Affiliates" is a significant term and its inclusion has consequences. The non-solicits are unreasonably broad and unenforceable.

The balance of the equities analysis is like that for the EA non-compete. Defendants were compensated as regional executives and the business sold was regional. But the restriction exceeds SRP's geographic footprint and BluSky's

---

[81] *Id.* § 6(c.)(iii.).

legitimate business interest in its acquired entity. The non-solicit covenant is excessive in scope and is unenforceable.

## 3. Confidentiality

Defendants argue that the confidentiality restrictions in the EA are unenforceable because they do not advance BluSky's legitimate business and are substantively and temporally overbroad. In response, BluSky contends that the confidentiality agreement is enforceable when viewed through the perspective of breach of contract instead of restrictive covenant. Like the non-solicit, BluSky asserts that embedded modifiers limit the scope to BluSky's legitimate business interest. EA section 5(a) spells out the confidentiality restriction:

> Protection of Proprietary Information. Executive acknowledges that the continued success of the Employer and its Subsidiaries and Affiliates depends upon the use and protection of a large body of Proprietary Information. Executive agrees that he shall not disclose to any other Person any Proprietary Information or use at any time, either during his employment and/or service with the Employer or thereafter, any Proprietary Information of which Executive is or becomes aware (or has previously become aware) during or as a result of his employment with the Employer (whether prior to or after the date hereof), whether or not such information is developed by Executive, except to the extent that such disclosure or use is related to and required by Executive's performance of duties assigned to Executive by the Chief Executive Officer or is otherwise permitted under this Agreement.

> "Proprietary information" is defined as:

> all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential" and now

31

existing or to be developed in the future), in any form or medium (paper, electronic, in Executive's memory, or otherwise stored or recorded), whether oral or written, that relates to or results from the Business, historical or projected financial results, products, services, research or development, or operations of the Employer or any of its Subsidiaries or Subsidiaries or their respective suppliers, distributors, customers, independent contractors or other business relations. Proprietary Information will be interpreted as broadly as possible to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to the Employer's or its Subsidiaries' or Affiliates' (including their predecessors' prior to being acquired by the Employer or any Subsidiary) current or potential business and (b) is not generally or publicly known.

I first address how to frame review of the confidentiality provision: whether as restrictive covenant or breach of contract. BluSky asks me to find that a confidentiality agreement is simply a contract that prevents a party from disclosing the other party's confidential information, rather than being a restrictive covenant. *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1219 (Del. 2012). BluSky suggests that under *Martin Marietta*, the confidentiality agreement differs from "preventing a party from engaging in certain hostile or competitive activity."[82] The reliance on *Martin Marietta* is misplaced. That case dealt with a hostile takeover and a comparison between standstill agreements and confidentiality agreements. *Martin Marietta*, 68 A.3d, at 1218 (Del. 2012) (finding that "Standstill

---

[82] RB at 16.

32

agreements and confidentiality agreements are qualitatively different."). BluSky's attempt to bridge the gap from hostile takeover to competitive restrictions and confidentiality provisions goes too far. Unlike BluSky's argument above, the *Martin Marietta* Court did not add competitive activity into the hostile takeover mix. This Court has repeatedly analyzed confidentiality provisions under the restrictive covenant framework. *See, e.g.*, *Fortiline*, 2024 WL 4088629, at *4–5; *Kodiak*, 2022 WL 52400507, at *11; *Intertek*, 2023 WL 2544236, at *6. I will do so here as well.

The confidentiality agreement lacks a temporal limitation. It prohibits disclosure at any time, even after the Defendants leave BluSky's employ. The provision is not limited to the life of BluSky, its subsidiaries, and affiliates. The lack of a temporal limit is a factor but is not determinative. Restrictive covenants are reviewed holistically. *Sunder Energy, LLC*, 305 A.3d at 753 (Del. 2023). The confidentiality agreement is substantively overbroad. Even so, I disagree with Defendants that "proprietary information" includes all non-public information.[83] The first sentence of the definition constrains it to confidential or proprietary information. Yet the definition of "proprietary information" is still not appropriately limited. As BluSky notes, the first sentence of the definition does not include "affiliates." But the second sentence does. And that second sentence construes

---

[83] AB at 53.

33

"proprietary information" as broadly as possible. The inclusion of "affiliates" modifies the entire definition to make it impermissibly broad. As this Court has previously held:

> A covenant including the employer's affiliates is 'not tailored to [the employee's] role while employed,' and the inclusion of affiliates in different sectors and different countries is 'not essential to the protection of [the employer's] legitimate business functions.' It also presents the probability that a restrained party could unknowingly breach the covenant. Where a plaintiff fails to show any legitimate business interest served by shielding all its unspecified affiliates from the restrained party's competition, and fails to show the restrained party had access to any kind of information that would warrant that restriction, the plaintiff has failed to justify the restrictive covenant as drafted." *Fortiline*, 2024 WL 4088629, at *4 (internal citations omitted).

The definition also includes the confidential or proprietary information of BluSky's and its subsidiaries' "respective suppliers, distributors, customers, independent contractors or other business relations." For instance, this would cover the confidential and proprietary information of a janitorial service that cleans the BluSky or BluSky subsidiary's office space. Such a scope extends far beyond the confidential information that Defendants would have access to and characterizes the impermissible overbreadth of the provision.

Similarly, as the Court found in *Sunder*, while a two-year restrictive covenant is not per se unreasonable, it must be geographically tempered. It is not here. Under the non-solicit of employees section 6(b), it is overly broad.

34

**D.    The KPSKY agreements suffer from the same failings as the EAs.**[84]

After Defendants were BluSky vice presidents for more than two years KPSKY, BluSky's parent, granted 396 Incentive Units to Robbins and 795 Incentive Units to Popwell.[85]   The Incentive Unit Award included the RCAs.  The RCAs contained non-compete, non-solicit, confidentiality, and return of materials provisions.

Defendants, as they did with the EA non-compete, non-solicit, and confidentiality restrictions, assert that the RCA provisions are unenforceable because they are substantively and geographically overbroad.  In response, BluSky argues that the Defendants' focus on "affiliates" distracts from the Defendants own misdeeds in violating the restrictive covenants.  In any event, BluSky asks the Court to adopt a more restrained interpretation of "affiliates."[86]

The RCAs are between KPSKY, BluSky, and the individual Defendants, but the contract language involves other entities as well.[87]  KPSKY and BluSky are collectively called "the Company."  KPSKY, BluSky, and their affiliates are "Company Parties."[88]  The RCA defines affiliates as:

---

[84] Robbins' and Popwell's RCA are substantially similar, so I consider them jointly.

[85] Am. Compl. ¶ 76.; Am. Compl. Ex. D and E.

[86] RB at 33.

[87] RCA Preamble.

[88] *Id.*

any individual, corporation, partnership, association, joint-stock company, trust, unincorporated association or other entity (other than the Company) that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Company and any member of an affiliated group of which the Company is a common parent corporation.[89]

The "Restricted Period" is the term of Defendants' service plus two years after the end of service.[90]

The RCAs occurred as part of Defendants' employment rather than due to SRP's sale to BluSky. In the sale of the business context, the RCA "must be tailored to the competitive space reached by the seller and serve the buyer's legitimate economic interests." *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023) (citing *FP UC*, 2020 WL 1492783, at *7)). Outside the sale of a business context, however, the Court undertakes a more searching inquiry. Rather than "tick through individual features of a restriction in isolation," the Court will consider the RCA "synergistically." *Sunder Energy, LLC*, 305 A.3d at 753.

### 1. The RCA Non-Compete

The RCA non-competition restriction provides:

---

[89] RCA § 1(b).

[90] *Id.* § 7.

During the Restricted Period (as defined below), the Participant will not, anywhere in any geographic area in which any Company Party conducts business at any time during the period of the Participant's Service or, with respect to the portion of the Restricted Period that follows the termination of such Service, at the time of such termination, participate in the Restricted Business (as defined below). For purposes of this Agreement, (i) the term "participate" means to have any direct or indirect interest or involvement, whether as an officer, director, employee, partner, member, manager, sole proprietor, agent, representative, independent contractor, consultant, franchisor, franchisee, creditor, owner or otherwise; provided, however, that the term "participate" shall not include ownership of less than two percent of a class of stock of a publicly-held corporation which is traded on a national securities exchange or in the over-the-counter market, so long as the Participant does not have any active participation in the business or management of such entity; and (ii) the term "Restricted Business" means any business conducted by any Company Party during the period of the Participant's Service or, with respect to the portion of the Restricted Period that follows the termination of such Service, at the time of such termination.

The RCA's restricted period is Defendants' length of service plus two years. The geographic restriction encompasses any area where KPSKY, BluSky, or their affiliates conduct business. This includes upstream and downstream entities. It is also global in geographic breadth and is not limited to the type of business conducted by BluSky. BluSky suggests that the Court should adopt "a much more sensible and reasonable construction of 'Affiliates'" that does not include BluSky's upstream associated entities.[91] But that request ignores the plain meaning of the terms. This

---

[91] RB at 33.

Court will not torture contractual language to give it a meaning that was not intended. *AT&T v. Lillis*, 953 A.2d 241, 252 (Del. 2008) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."). The pertinent language in the "Affiliates" definition applies to "any other Person *controlling*, controlled by or under common control with the Employer or any of its Subsidiaries."[92] There is no question that the definition applies to both upstream and downstream entities. The Court will construe the language with the plain meaning the parties' intended. The restriction is unreasonably broad. It goes beyond BluSky's business interests and beyond its geography. As this Court has held, inclusion of affiliates who are not in the employer's competitive business space and locations could lead the restricted party to inadvertently violate the restriction. *Fortiline*, 2024 WL 4088629, at *4 (Del. Ch. Sep. 5, 2024) (A restrictive covenant that includes affiliates "presents the probability that a restrained party could unknowingly breach the covenant."). The non-compete parameters are broader than necessary to satisfy BluSky's legitimate business interest.

Balancing the equities between BluSky and Defendants does not change the analysis. It is unclear whether Defendants are sophisticated parties. They grew a

---

[92] EA § 22 (emphasis added).

successful remediation and restoration business. Presuming that they were business savvy, they were over two years removed from the sale of the business. The leverage to bargain for different restrictions when KPSKY granted them incentive units was gone. While I presume that the incentive units have inherent value, the complaint lacks unit valuation that would lead me to believe that Defendants were adequately compensated for such a broad restriction. The RCA non-compete is unenforceable.

## 2. The RCA Non-Solicit

The non-solicit provision prohibits Defendants from acting to:

(a) employ, engage or directly or indirectly solicit for employment or engagement any individual who is an employee of any of the Company Parties (or was an employee of any such entities during the year preceding such solicitation) or otherwise seek to adversely influence or alter such individual's relationship with any of the Company Parties; or

(b) directly or indirectly solicit or encourage any customer, supplier or vendor of any Company Party, or any prospective customer, supplier or vendor of any Company Party, to terminate, diminish or otherwise alter his or its relationship with any Company Party or to conduct with any other Person any business that such customer, supplier or vendor (or prospective customer, supplier, or vendor) could conduct with any Company Party; provided, however, that these restrictions shall apply (y) only with respect to those Persons who are or have been a customer, supplier or vendor of any Company Party at any time within the eighteen (18)- month period immediately preceding the activity that is restricted by this Section 6(b) or whose business has been solicited on behalf of any Company Party by any of their officers, employees or agents within such eighteen (18)-month period, other than by form letter, blanket mailing or published advertisement, and (z) only if the Participant has performed work for such Person during the Participant's Service or been introduced to, or otherwise had contact with, such Person as a result of the Participant's Service or has had

access to Confidential Information which would assist in the Participant's solicitation of such Person.

The non-solicit suffers from the same overreach issues as the non-compete. The term "Company Parties" includes KPSKY, BluSky, and their affiliates. Including all affiliates, wherever they are and in whatever business field is well beyond the reasonable range of BluSky's legitimate business and geographic interest. The non-solicit provision is overly broad and unenforceable.

### 3. RCA Confidentiality

The RCAs restrict the Defendants from disclosing confidential information other than as necessary to perform their duties as employees.[93] The restriction ends only when the confidential information becomes generally known to the public.[94] Temporally, the restrictions could be endless. The RCA defines Confidential Information as:

> any and all confidential, proprietary or trade secret information, whether disclosed, directly or indirectly, verbally, in writing or by any other means in tangible or intangible form, including that which is conceived or developed by the Participant, applicable to or in any way related to: (i) the present or future business of any of the Company Parties; (ii) the research and development of any of the Company Parties; or (iii) the business of any client or vendor of any of the Company Parties.

---

[93] RCA § 1(a).

[94] *Id.*

As with the RCA non-compete and non-solicit restrictions, "Company Parties" includes all KPSKY and BluSky upstream and downstream affiliates. This Court has consistently found such restrictions to be overbroad and unenforceable. *Fortiline*, 2024 WL 4088629, at *1, 4–5; *Intertek,* 2023 WL 2544236, at *6; *Kodiak*, 2022 WL 5240507, at *4–5. BluSky argues that KPSKY granted Defendants equity in the KPSKY family and "contemplated access to broader categories of information within that corporate family."[95] In the context of the employer-employee relationship with Defendants, BluSky had a reasonable expectation of Defendants' access to confidential BluSky information beyond the footprint of the original SRP sale. But to suggest that Defendants' equity interest in the KPSKY family would give them access to the confidential information of every company under the corporate umbrella oversteps the mark. Even reasonably broader access within the corporate family would not extend to every affiliate.

A Return of Materials provision is concurrent with the Confidentiality restriction.[96] This restriction requires Defendants to return all materials containing the KPSKY, BluSky, and their affiliates' confidential information to the company. The requirement is subject to the same analysis as the Confidentiality restriction and

---

[95] RB at 20.

[96] RCA § 2.

41

suffers the same fate. The Return of Materials constraint encompasses materials at all BluSky's affiliates, out of Defendants' access and reach. I find this requirement to be unenforceable for the same reasons as the Confidentiality Agreement.

**E.      The Court Declines to Blue Pencil the Unenforceable Restrictions**

BluSky urges me to blue pencil any overbroad restrictive covenants.[97]  This Court may blue pencil "expansive non-competes to supply judicious limitations." *Intertek*, 2023 WL 2544236, at *5.  I will not do so here.  "Where noncompete or nonsolicit covenants are unreasonable in part, Delaware courts are hesitant to 'blue pencil' such agreements to make them reasonable." *Kodiak*, 2022 WL 5240507, at *4 n.49.  The restrictions are overbroad in a variety of ways—geographically, temporally, and substantively.  If I blue pencil these provisions, it would eliminate the goal- requiring parties to draft restrictions specifically tailored to the parties' circumstances and legitimate business interests.  Blue penciling would incentivize future parties to compose restrictions without appropriate accuracy and precision, certain in the belief that the Court would be a safety net for any overreach.  I decline to blue pencil the restrictive covenants.

---

[97] RB at 39.

**F. The Preliminary Injunction is Denied Because BluSky Has Not Shown a Reasonable Likelihood of Success on the Merits**

BluSky's Amended Verified Complaint alleges six Breach of Contract Claims.[98] The claims are broken down into three claims against each Defendant for violating the restrictive covenants in the EPA, the EAs, and the RCAs, respectively. The elements required to grant a preliminary injunction are well known. BluSky must prove "(i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction." *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.,* 506 A.2d 173, 179 (Del. 1986)).

I have found each of the restrictive covenants unenforceable. As a result, BluSky is not reasonably likely to succeed on the merits. Having failed to meet the initial element, BluSky's request for preliminary injunction is denied. I do not address the remaining preliminary injunction elements.

**CONCLUSION**

For the reasons explained above, I recommend that BluSky's request for preliminary injunction be denied and the Defendants' Motion to Dismiss be granted

---

[98] Am. Compl. ¶¶ 93–150.

on all counts for failure to state a claim. This is a Final Report under Court of

Chancery Rule 144.